[Crim. No. 34543. Second Dist., Div. One. Feb. 29, 1980.]

THE PEOPLE, Plaintiff and Respondent, v.
LEE DONALD LAKEY, Defendant and Appellant.

**COUNSEL**

Quin Denvir, State Public Defender, Edward H. Schulman and Michael Tanaka, Deputy State Public Defenders, for Defendant and Appellant.

George Deukmejian, Attorney General, Robert H. Philibosian, Chief Assistant Attorney General, S. Clark Moore, Assistant Attorney General, William R. Weisman, Robert R. Anderson and Elizabeth A. Baron, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

LONDON, J.*—This appeal is taken from a determination by the superior court that defendant remain committed as a mentally disordered sex offender (MDSO) for an additional year pursuant to section 6316.2 of the Welfare and Institutions Code.[1]

### FACTS

In 1973, defendant was convicted of involuntary manslaughter. Thereafter, both the court and a jury determined that defendant was a mentally disordered sex offender and defendant was committed to the Department of Health for placement in a state institution.[2]

He was committed to Atascadero State Hospital and remained there until November 1977, at which time a petition was filed pursuant to section 6316.2 to extend his commitment.[3] During the period of his commitment at Atascadero, defendant was provided, and at times accepted, treatment for his mental disorder. He was, however, for the most part not cooperative. His refusal to cooperate in therapy and treatment began near the time of his initial commitment to Atascadero and became more pronounced as time passed. As a result of his lack of cooperation, in 1975, defendant was returned to the superior court for sentencing pursuant to section 6325.[4] In 1977, shortly before enactment of section 6316.2, the staff at Atascadero again prepared a preliminary recommendation to return defendant to the superior court forcing sentencing pursuant to section 6325.

---

*Assigned by the Chairperson of the Judicial Council.

[1]All references are to the Welfare and Institutions Code unless otherwise indicated.

[2]The jury was instructed under a preponderance of the evidence standard and the court found that defendant could *not* benefit from treatment in a state hospital.

[3]Defendant's release date, as computed under the determinate sentencing law (Sen. Bill No. 42 and Assem. Bill No. 476) was October 17, 1977. The release date had originally been mistakenly computed to be January 15, 1978. The error was not discovered until after the initiation of the extension proceedings.

[4]Welfare and Institutions Code section 6325 provides: "Whenever a person who is committed for an indeterminate period to the department for placement in a state hospital or to a county mental health director for placement in an appropriate facility...(b). has not recovered, and in the opinion of the superintendent...the person is still a danger to the health and safety of others, the superintendent...of the hospital ...shall file with the committing court a certification of his opinion..., including therein a report, diagnosis and recommendation concerning the person's future care, supervision or treatment.... [T]he committing court shall thereupon order the return of the person to said committing court and shall thereafter cause the person to be returned to the court in which the criminal charge was tried to await further action with

After the passage of section 6316.2, it was determined by the medical director at Atascadero State Hospital to seek extension of defendant's term pursuant to section 6316.2 rather than returning defendant to the superior court for sentencing pursuant to section 6325. The reason for that decision was it was believed that section 6316.2 provided a legal method of extending the term of defendant's confinement and that such an extension was in the public interest because defendant remained mentally disordered and very dangerous.

As the record of the instant proceedings under section 6316.2 quite clearly discloses, the court was appreciative of defendant's contention that his amenability to treatment was a basic concern in determining whether his commitment could be extended. A major focus of consideration, on which substantial evidence was received, was whether defendant's "lack of cooperation" in treatment was a product of his own volition and something over which he had control, or, if it was itself, a result of his mental disorder. Also subject to inquiry was the ability and willingness of the Department of Health to formulate and implement a treatment plan designed to improve defendant's willingness to cooperate.

During a motion to dismiss the petition, heard by the court sitting without a jury, David Bourne, a program director and psychiatric technician at Atascadero, testified that it was possible that defendant could not cooperate because of his mental disorder. Dr. Ronald Markman, a psychiatrist appointed by the court, testified that defendant was "an individual who . . . refuses to cooperate, but is making a volitional choice," and is "capable of cooperation." Both Mr. Bourne and Dr. Markman were of the opinion that defendant would have benefited if he would have cooperated in treatment.[5]

---

reference to such criminal charge. [¶] Such court shall resume the proceedings, upon the return of the person to the court, and after considering all the evidence before it may place the person on probation upon such terms as may be required to protect the public if the criminal charge permits such probation and the person is otherwise eligible for probation. In any case, where the person is sentenced on a criminal charge, the time the person spent under indeterminate commitment as a mentally disordered sex offender shall be credited by the court or community release board against such sentence."

For reasons not apparent from the present record, defendant was returned to Atascadero Hospital. Apparently, there were intervening habeas corpus proceedings instituted and then abandoned by defendant.

[5]Both Mr. Bourne and Dr. Markman were very guarded in their opinions as to the probability that defendant would ever cooperate in treatment. Mr. Bourne was "60% doubtful!" that defendant would participate and Dr. Markman thought the potential of

Mr. Bourne testified that he believed it possible to implement a treatment program for defendant which would take into consideration his refusal to cooperate.

The trial judge, after consideration of this evidence, determined that: "We have a man who might possibly benefit from treatment, who is capable of benefitting [*sic*] from treatment, should he undertake cooperation relative thereto, and who is highly motivated not to cooperate for practical reasons. . . ."[6] After the denial of defendant's motion to dismiss the petition defendant was tried by a jury. The evidence presented to the jury included, insofar as is important to this appeal, statements made by defendant to psychiatric technicians at Atascadero State Hospital; evidence concerning defendant's participation and non-participation in various therapies; and the testimony of Dr. Markman. The jury was instructed that it had to determine whether defendant presently suffered from a mental disorder, whether defendant, as a result of such mental disorder was presently disposed to the commission of crime primarily for the purposes of sexual arousal or gratification and whether defendant's predisposition to the commission of such crime presented a serious threat of substantial harm to the health and safety of others. The phrase "mental disorder" was defined to be any abnormal condition of the mind causing and/or permitting conduct of the type not acceptable to society as expressed in its criminal statutes *and of a nature changeable with or by treatment.* "Substantial harm," was defined to mean "such harm that is more than slight or trivial." The jury was required to determine that the allegations of the petition were true beyond a reasonable doubt and did so.

## ISSUES

In challenging the extension of his term as an MDSO, defendant contends on appeal:

1. In order to extend his commitment as an MDSO, it was constitutionally required that it be shown, beyond a reasonable doubt, that he was amenable to treatment.

---

cooperation was "almost nil" and that further attempts to treat defendant would be "a waste of time and energy on the part of medical personnel."

[6]The court also indicated "some doubt as to what's happening up at Atascadero right now with respect to Mr. Lakey's possible future treatment. That doubt includes the possibility of their doing something premised upon Mr. Lakey's proven lack of cooperation."

2. There was insufficient evidence to show that he was amenable to treatment.

3. Section 6316.2 is unconstitutional in that it violates guarantees of equal protection, and that it is void for vagueness.

4. Statements made by him to psychiatric technicians at Atascadero State Hospital during the course of therapy sessions were privileged; accordingly, the court erred in admitting those statements in evidence.

5. Defendant is entitled to immediate release in that (a) the court erred in interpreting section 6316.2, subdivision (f) as commencing to run subsequent to a finding of extension, and, alternatively, (b) defendant is, pursuant to Penal Code section 2900.5, entitled to credit for time served before extension of his commitment.

DISCUSSION

I

WELFARE AND INSTITUTIONS CODE SECTION
6316.2 DOES REQUIRE A FINDING OF
AMENABILITY TO TREATMENT

Section 6316.2, by its terms,[7] does not explicitly require a finding of amenability to treatment. However, we are unable to agree with respondent that an MDSO's commitment to a mental health facility may be extended pursuant to section 6316.2 without a showing that an MDSO is amenable to treatment. We agree with the recent decision in *People v. Compelleebee, supra,* 99 Cal.App.3d 296, that there must be a finding of amenability.

---

[7]At the time of defendant's extension hearing, section 6316.2 provided in relevant part: "(a) A person may be committed beyond the term prescribed by Section 6316.1 only under the procedure set forth in this section and only if such person meets all of the following: [¶] (1) The 'sex offense' as defined in subdivision (a) of Section 6302 of which the person has been convicted is a felony, whether committed before or after July 1, 1977, or is a misdemeanor which was committed before July 1, 1977. [¶] (2) Suffers from a mental disease, defect, or disorder, and as a result of such mental disease, defect, or disorder, is predisposed to the commission of sexual offenses to such a degree that he presents a serious threat of substantial harm to the health and safety of others."

Section 6316.2 was amended in 1979 to add subdivision (j), which states: "Amenability to treatment is not required for a finding that any person is a person as described

■ According to section 6316, a person found to be an MDSO may not initially be committed to a state hospital or other mental health facility unless a finding is made that "the person could benefit by treatment." Because it is constitutionally required that a person committed for treatment as an MDSO actually be given treatment (*People v. Feagley, supra*, 14 Cal.3d 338, 339), we believe that such treatment should be meaningful. As the court said in *People v. Feagley, supra*, at page 359: "...Not only is medical treatment the *raison d'etre* of the mentally disordered sex offender law, it is its sole constitutional justification. It is settled that 'A person committed as a mentally disordered sex offender is not confined for the criminal offense but because of his *status* as a mentally disordered sex offender.' (Italics added.)...

"But involuntary confinement for the 'status' of having a mental or physical illness or disorder constitutes a violation of the cruel and unusual punishment clauses of both the state and federal Constitutions [citations] unless it is accompanied by adequate treatment. [Citations.] 'When patients are so committed for treatment purposes they unquestionably have a constitutional right to receive such individual treatment as will give each of them a *realistic opportunity to be cured or to improve his or her mental condition.* [Citations.] Adequate and effective treatment is constitutionally required because, absent treatment, the hospital is transformed "into a penitentiary where one could be held indefinitely for no convicted offense." [Citation.] The purpose of involuntary hospitalization for treatment purposes is *treatment* and not mere custodial care or punishment. This is the only justification, from a constitutional standpoint, that allows...commitments to mental institutions....' [Citations.]" (Italics added.)

*People v. Compelleebee, supra*, 99 Cal.App.3d 296, decided on November 30, 1979, states: "...we conclude both by reason of constitutional mandate and statutory construction that a finding that an MDSO 'could benefit' from treatment must be made before an MDSO may have his commitment extended under section 6316.2." (At p. 302.)

---

in subdivision (a), nor is it required for treatment of such person. Treatment programs need only be made available to such person. Treatment does not mean that the treatment be successful or potentially successful, nor does it mean that the person must recognize his or her problem and willingly participate in the treatment program."

We do not believe that subdivision (j) applies to the present case. As may be inferred from our opinion, we are doubtful of the constitutionality, under *People v. Feagley* (1975) 14 Cal.3d 338 [121 Cal.Rptr. 509, 535 P.2d 373] and *People v. Compelleebee* (1979) 99 Cal.App.3d 296 [160 Cal.Rptr. 233], of commitments where there is no prospect of meaningful treatment.

The reasoning of the court in *Compelleebee* is that *People* v. *Feagley, supra,* held it constitutionally impermissible to commit an MDSO to a hospital for treatment when he could not benefit therefrom, and that the same rationale should apply to a recommitment.

 If, as the Supreme Court states, "'a realistic opportunity to be cured or to improve his or her mental condition,'" is the only "'justification, from a constitutional standpoint,'" which supports the original commitment of an MDSO, we believe it patently improper to construe section 6316.2 to allow the extension of a commitment in the absence of a credible determination that such extended commitment will provide such opportunity. A person who is *not amenable* to treatment has, by definition, no "'realistic opportunity to be cured or to improve.'" For this reason, we read section 6316.2 to require a finding of amenability. We note that the statutory scheme indicates an apparent legislative purpose to confine persons who are amenable to treatment in hospitals and treat them but, on the other hand, to incarcerate persons who are not subject to treatment in nonhospital institutions.

Adverting to the argument of respondent, it suggests that, because defendant was originally committed and remains in a treatment program at Atascadero, it can be "presumed" that he is now an MDSO and that he will benefit by treatment. Whatever value this suggestion might have, it cannot be adopted under the facts of the present case. The argument falls because the trial court, at the time of the original commitment, found that defendant "*could not* benefit from treatment in a state hospital." Therefore, it is entirely appropriate and, we believe, necessary that defendant's present amenability to treatment be determined before his commitment is extended. (See also *In re Moye* (1978) 22 Cal.3d 457, 460 [149 Cal.Rptr. 491, 584 P.2d 1097]; *In re Ingram* (1978) 76 Cal.App.3d 495, 499 [142 Cal.Rptr. 825]; *People* v. *Stuart* (1980) 100 Cal.App.3d 685 [161 Cal.Rptr. 236].)

II

 THERE WAS SUFFICIENT EVIDENCE OF DEFENDANT'S AMENABILITY

Although defendant contends, on appeal, the contrary, we are satisfied that there was ample evidence to support the court's conclusion that, if defendant cooperated in treatment, the condition of his mental disorder would improve. Thus, it is evident that the peculiar and central

question is whether defendant's desire not to cooperate or his inability to cooperate rendered him unable to benefit from treatment.

■ In making this determination, we are bound to "view the evidence in a light most favorable to respondent and presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence. [Citation.] If the circumstances reasonably justify the trial court's findings, reversal is not warranted merely because the circumstances might also be reasonably reconciled with a contrary finding. [Citations.] The test on appeal is whether there is substantial evidence to support the conclusion of the trier of fact; it is not whether guilt is established beyond a reasonable doubt. [Citation.]" (*People* v. *Redmond* (1969) 71 Cal.2d 745, 755 [79 Cal.Rptr. 529, 457 P.2d 321].)

■ Our conclusion that defendant's lack of cooperation in treatment was not of a nature sufficient to render him unamenable to treatment is premised upon two major considerations. First, we believe it patently unwise to give a person committed to treatment what is in essence a veto power. If a patient can render himself unamenable to treatment by simply refusing to cooperate in therapy programs set up for his benefit, the state's fundamental interest in treating and, hopefully, curing those persons with dangerous mental disorders would be frustrated. We are inclined to agree with the trial judge who stated, "the People of this State have an entitlement, in view of that which has occurred in Mr. Lakey's life and in the life of his victim, to insist that he, so long as there are programs available for his treatment at Atascadero, cooperate in—those programs...."

We are, of course, troubled, as was the trial court, by the relative paucity of evidence supporting the proposition that the state hospital was capable and willing to treat defendant (and we presume others similarly situated) who clearly manifest no desire to be involved in treatment. It seems apparent that, prior to the passage of section 6316.2, the staff at Atascadero operated upon the premise that a person who did not cooperate was not amenable. In *People* v. *Feagley, supra*, 14 Cal.3d at page 369, the court quotes Dr. Sterling W. Morgan, a former medical director at Atascadero State Hospital and Harold V. Field, a former superintendent of the California Men's Colony as stating that "'A person determined to be a mentally disordered sex offender is considered to be amenable to treatment within the facilities of the Department of Mental Hygiene *if he recognizes that he has a problem*,

indicates a desire for help, and cooperates in treatment programs offered at Atascadero. ...[¶] Conversely, *someone who does not think that he has a problem,* or who does not want help, or who cannot participate in or benefit from our treatment program because his predisposition towards violence renders him primarily a custodial problem, is not considered amenable....' (Italics added.)"

It appears from the evidence in the present case that the statements of Dr. Morgan and Mr. Field continued to represent the position of Atascadero State Hospital, until the passage of section 6316.2. Thereafter, according to Mr. Bourne, there was new consideration given to the question of amenability, and the concept was "broadened" to include in its definition the uncooperative patient.

Second, it appears that the trial court perceived and explored the very concern of which we speak and sufficiently assured itself that, if defendant's commitment were extended, the "Department of Health can now implement a viable, realistic, honest treatment program for Mr. Lakey." Therefore, we conclude that there was sufficient evidence to show that defendant was amenable, and that he would be given "'a realistic opportunity to be cured or to improve his or her mental condition....'" (*People* v. *Feagley, supra,* 14 Cal.3d at p. 359.)

### III

### ▮ SECTION 6316.2 IS CONSTITUTIONAL

Defendant's contention of constitutional infirmity in section 6316.2 is grounded on both equal protection and vagueness arguments, neither of which has merit. ▮ "...The first prerequisite to a meritorious claim under the equal protection clause is a showing that the state has adopted a classification that affects two or more *similarly situated* groups in an unequal manner...." (*In re Eric J.* (1979) 25 Cal.3d 522, 530 [159 Cal.Rptr. 317, 601 P.2d 549].)

▮ Accordingly, the equal protection argument would initially require a determination that persons such as defendant are *"similarly situated"* to MDSOs sentenced to state prison, and this determination cannot be made. Defendant and members of his class have been committed to the Department of Mental Health for *treatment purposes.* This, as we have indicated, is the touchstone of the entire legislative scheme. These persons are obviously in a class distinguished from those

persons who are committed to state prison, the purpose of which is *punishment for crime*. (Pen. Code, § 1170, subd. (a)(1).)

■ Defendant is of a different class from those persons with whom he compares himself, and the state may provide for distinctions with regard to different classes as long as the result does not amount to invidious discrimination. (*Gray* v. *Whitmore* (1971) 17 Cal.App.3d 1, 22-23 [94 Cal.Rptr. 904].) ■ Moreover, there is no invidious discrimination when the state has a compelling reason for its legislative distinction (*People* v. *Olivas* (1976) 17 Cal.3d 236 [131 Cal.Rptr. 55, 551 P.2d 375]), and, the state does have a compelling reason to devise a statutory scheme for extension of MDSO commitments, i.e., to protect the public and provide rehabilitative treatment. (*People* v. *Feagley, supra*, 14 Cal.3d 338; *People* v. *Oglesby* (1977) 67 Cal.App.3d 34 [135 Cal.Rptr. 640].)

We have recently recognized the constitutional validity of section 6316.2 in *People* v. *Stuart, supra*, 100 Cal.App.3d 685, in which we quoted from *In re Moye, supra*, 22 Cal.3d 457: "As in the case of MDSOs and other dangerous offenders, persons in petitioner's class properly, and *consistent with equal protection principles*, may be subjected to a period of extended commitment. . . ." (At p. 467; italics added.)

In *People* v. *Superior Court* (*Rigg*) (1978) 80 Cal.App.3d 407 [145 Cal.Rptr. 711], a challenge to section 6316.2's constitutionality was made on equal protection grounds. The statute was upheld because persons who are committed have been found to be MDSOs *who could benefit from treatment*, and that difference is the constitutional ground allowing extension in contrast to sentence to prison. On the same rationale section 6316.1, which mandates that the "'upper term'" be imposed on all persons committed as MDSOs, was upheld in *People* v. *Saffell* (1979) 25 Cal.3d 223 [157 Cal.Rptr. 897, 599 P.2d 92]. (See fn. 3; *People* v. *Compelleebee, supra*, 99 Cal.App.3d at p. 301.)

Lastly, we note that we here hold that "amenability" is a requisite to extension of commitment, furthering the conceptual distinction between treatment and incarceration which supports the constitutionality of section 6316.2.

■ Defendant's other constitutional attack, that section 6316.2 is "void for vagueness" must also fail. He contends the terms "mental dis-

order," "predisposed," "serious threat," and "substantial harm," are too indefinite to form a basis for involuntary commitment.

■ In ascertaining whether a statute is vague "The required meaning, certainty and lack of ambiguity may appear on the face of the questioned statute or from any demonstrably established technical or common law meaning of the language in question. [Citation.]" (*People v. Kirk* (1975) 49 Cal.App.3d 765, 769 [122 Cal.Rptr. 653].) In *People v. Kirk* the term "dangerous" as used in section 6300 was found not to be so vague as to violate due process. We are satisfied that the words from section 6316.2 attacked by defendant have more clarity and are subject to more "demonstrably established technical...meaning" than the word "dangerous."

## IV

■ Defendant's Statements to Psychiatric
Technicians Were Properly Admitted
at Trial

Defendant claims that his statements to psychiatric technicians at Atascadero were privileged communications between patient and psychotherapist. He relies principally on Evidence Code section 1012 and its provision that a "confidential communication" includes communication to a person who is not a psychotherapist as defined in Evidence Code section 1010, but is a person "to whom disclosure is reasonably necessary for the transmission of the information or the accomplishment of the purpose for which the psychotherapist is consulted...."

We are aware that "an environment of confidentiality of treatment is vitally important to the successful operation of psychotherapy." (*In re Lifschutz* (1970) 2 Cal.3d 415, 422 [85 Cal.Rptr. 829, 467 P.2d 557, 44 A.L.R.3d 1]), and that the effectiveness of the treatment given defendant and others similarly situated probably would be improved if complete confidentiality were accorded every statement made by a person involuntarily confined for the treatment of their mental disorders.

However, we recognize that the psychotherapist/patient privilege is legislatively created and is not absolute. Defendant has been confined as an MDSO because he took the life of another human being and is dangerous. The purpose of his confinement is not merely to treat his mental disorder, but to protect society. An important purpose of the close su-

pervision given persons who are confined as MDSOs is to gather information through which it is possible to predict their future behavior. It seems apparent that one legislative purpose in providing psychotherapy for MDSOs is to monitor their progress so that the decision to release the MDSO from confinement may be based upon as much information as possible. We cannot find any legislative intent to exclude testimony such as that presented in this matter because of any psychotherapist/patient privilege.

We believe our decision is supported by Evidence Code section 1024 which provides as follows: "There is no privilege under this article if the psychotherapist has reasonable cause to believe that the patient is in such mental or emotional condition as to be dangerous to himself or to the person or property of another and that disclosure of the communication is necessary to prevent the threatened danger."

The proceeding below was premised upon the belief of defendant's psychotherapist, and the medical staff at Atascadero State Hospital, that defendant constitutes "a serious threat of substantial harm to the health and safety of others," as provided in section 6316.2. As the Supreme Court stated in *Tarasoff* v. *Regents of University of California* (1976) 17 Cal.3d 425, 442 [131 Cal.Rptr. 14, 551 P.2d 334, 83 A.L.R.3d 1166], "the public policy favoring protection of the confidential character of patient-psychotherapist communications must yield to the extent to which disclosure is essential to avert danger to others. The protective privilege ends where the public peril begins."

V

The One-year Extension Provided
by Section 6316.2 Commenced at
the Time of the Finding and Order
Extending the Commitment

Section 6316.2, subdivision (f) provides, in relevant part, that: "A commitment or a recommitment under Section 6316.1 shall be for a period of one year from the date of termination of the previous commitment."

Defendant contends that his "previous commitment" ended, at the latest, on October 17, 1977, and that the maximum one-year extension therefore terminated on October 17, 1978. Alternatively, petitioner

claims that, if his term of commitment began on October 27, 1978 (the date the court determined he came within the extension provisions of § 6316.2), he should be entitled to credit under Penal Code section 2900.5.[8]

Under both theories, defendant would have been entitled to immediate release on October 17, 1978, some 10 days before he was found subject to the extension provisions of section 6316.2. If defendant is correct, the extension proceeding, concluded October 27, 1978, at most, gave retroactive approval to defendant's previous commitment, and in no way authorized his further commitment. We are unable to accept defendant's contentions.

Section 6316.1 provides in pertinent part: "(a) In the case of any person found to be a mentally disordered sex offender who committed a felony on or after July 1, 1977, the court shall state in the commitment order the maximum term of commitment, and the person may not be kept in actual custody longer than the maximum term of commitment, except as provided in Section 6316.2...." Accordingly, this section, by its terms, does not apply to defendant, who committed a felony in 1973.

Section 6316.2 states that proceedings for the extension of an MDSO's commitment should begin and be concluded before the "previous commitment" terminates. In defendant's case, it was impossible that the literal language of section 6316.2 be complied with and we must, as a result, determine what the probable legislative intention is. (*People* v. *Superior Court* (*Rigg*), *supra*, 80 Cal.App.3d 407.) As we recognized recently in *People* v. *Stuart, supra,* 100 Cal.App.3d 685, 691: "It is quite proper to commence extended commitment proceedings within a *reasonable* time prior to or *soon after* completion of the maxi-

---

[8]Penal Code section 2900.5 provides, in pertinent part: "(a) In all felony and misdemeanor convictions, either by plea or by verdict, when the defendant has been in custody, including but not limited to any time spent in a jail, camp, work furlough facility, halfway house, rehabilitation facility, hospital, prison, juvenile detention facility, or similar residential institution, all days of custody of the defendant, ...and including days credited to the period of confinement pursuant to Section 4019, shall be credited upon his term of imprisonment.... If the total number of days in custody exceeds the number of days of the term of imprisonment to be imposed, the entire term of imprisonment shall be deemed to have been served.... [¶] (b) For the purposes of this section, credit shall be given only where the custody to be credited is attributable to proceedings related to the same conduct for which the defendant has been convicted. Credit shall be given only once for a single period of custody attributable to multiple offenses for which a consecutive sentence is imposed."

mum term of commitment, as was decided in *People* v. *Superior Court* (*Rigg*) (1978) 80 Cal.App.3d 407, 416...."

Where the determination to extend is not made prior to the termination of the previous commitment, and the reason for such a delay is, as here, a result of the impossibility of giving section 6316.2 literal application,[9] the one-year extension term should begin from the date of the determination to extend.[10]

Any other decision would create an unworkable result. For example, in the present case, acceptance of defendant's contentions would mean that proceedings to extend his commitment for a second year should have begun before the instant proceedings to extend defendant's commitment for the first year. Such was not the legislative intent. The intent is, in essence, that a determination as to whether a person's commitment should be extended pursuant to section 6316.2 is subject to yearly review and redetermination. It does not serve any legitimate function to require such a determination to be made more than once each year. For these most practical reasons, we reject defendant's contention.

■ Defendant's alternative contention that Penal Code section 2900.5 dictates credit for time served awaiting his extension hearing is likewise unmeritorious. Adoption of that position would also thwart the legislative intent. Section 6 of chapter 164 of Statutes of 1977 states in part: "This act is designed to provide additional safeguards against the premature release of dangerous persons...." And, the extension procedure (§ 6316.2) is intended to help forward that purpose, while affording procedural safeguards by yearly review.

---

[9]We note from the record that the delay was, in part, the result of action by defendant, particularly his motion to dismiss the petition, request for continuance of the hearing and trial, and his filing of a petition for writ of mandate, resulting in the issuance of an order staying proceedings.

[10]Our reasoning here is consistent with our recent holding in *People* v. *Stuart* (1980) 100 Cal.App.3d 685 [161 Cal.Rptr. 236]), the facts of which are distinguishable. There, we concluded that the court was without jurisdiction to extend a commitment (under Pen. Code, § 1026, subd. (a)) where the petition was *filed* by the state one year, four months and twenty days after the termination of the maximum period of incarceration. Here, the petition to extend commitment (under Welf. & Inst. Code, § 6316.2) was filed on October 17, 1977, the *very same day* on which the maximum term was to expire. Moreover, defendant here has not raised the issue of timely *filing*, only the issue we resolve regarding *commencement* of the *time* of the *extension*.

Application of "credit" under section 2900.5 to a situation such as this would necessitate new extension proceedings under section 6316.2 to commence while other such proceedings were unresolved.

DISPOSITION

The judgment is affirmed.

Lillie, Acting P. J., and Hanson, J., concurred.

Appellant's petiton for a hearing by the Supreme Court was denied April 24, 1980. Newman, J., was of the opinion that the petition should be granted.