[Crim. No. 34727. Second Dist., Div. Five. June 27, 1980.]

THE PEOPLE, Plaintiff and Respondent, v.
ROBERT MARTIN, Defendant and Appellant.

COUNSEL

Herbert F. Blanck, under appointment by the Court of Appeal, for Defendant and Appellant.

George Deukmejian, Attorney General, Robert H. Philibosian, Chief Assistant Attorney General, S. Clark Moore, Assistant Attorney General, John R. Gorey and Michael Nash, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**STEPHENS, J.**—Appellant seeks review of the trial court's extension of his commitment as a mentally disordered sex offender (MDSO) made pursuant to Welfare and Institutions Code section 6316.2.[1] He contends (1) that a showing and finding of amenability to treatment was a prerequisite to an order recommitting appellant for an additional period, notwithstanding the absence of an express statutory requirement

---

[1]All references are to the Welfare and Institutions Code unless otherwise indicated.

that such a showing and finding be made; (2) that the finding of amenability made by the court was not supported by substantial evidence; and (3) that the statute authorizing recommitment (§ 6316.2) was unduly vague, thereby depriving appellant of his liberty without due process of law.

In an information, appellant was charged in count I with kidnaping, in violation of Penal Code section 207; in count II with lewd conduct on a child under the age of 14, in violation of Penal Code section 288; in count III with forcible oral copulation on a child under the age of 14, in violation of Penal Code section 288a. These offenses were alleged to have been committed upon a four-year-old girl. Appellant pled guilty to the crime charged in count II. On the court's motion, counts I and III were dismissed in the interest of justice.

On May 23, 1975, the superior court adjourned criminal proceedings and certified appellant for hearing and examination to determine if he was an MDSO. The court thereafter found that appellant was an MDSO within the meaning of section 6300 et seq. Defendant was committed to the Department of Health for confinement in Atascadero State Hospital.

On August 24, 1977, the Community Release Board computed appellant's maximum term as ending on April 1, 1979. The People subsequently filed a petition in the superior court to extend appellant's commitment as an MDSO pursuant to section 6316.2. On December 15, 1978, appellant petitioned for a hearing to determine whether he should be released. The court appointed three psychiatrists to report on appellant's status as an MDSO. On February 20, 1979, trial was subsequently commenced. The court found that appellant was still an MDSO and that he was amenable to treatment, and extended his commitment one year—April 1, 1980.[2]

I.

Appellant initially contends that a person committed to a treatment facility as an MDSO may not be recommitted for an additional period

---

[2]We note that the appeal is not moot even though the judgment appealed from extended appellant's MDSO commitment only until April 1, 1980, which has now passed. The court is informed that a new extension hearing for appellant was set to begin on June 2, 1980. Since several of the same issues involved in this appeal will also be involved in the new extension hearing, the appeal is not moot.

of hospital treatment unless it is found that such person could benefit from treatment. Two recent cases decided during the pendency of this appeal have confronted this issue. (*People* v. *Lakey* (1980) 102 Cal. App.3d 962, 971-972 [162 Cal.Rptr. 653]; *People* v. *Compelleebee* (1979) 99 Cal.App.3d 296, 301-302 [160 Cal.Rptr. 233].) These cases, relying primarily upon *People* v. *Feagley* (1975) 14 Cal.3d 338 [114 Cal.Rptr. 663], hold that to recommit an MDSO to a hospital for additional treatment when he could not benefit from such treatment would constitute cruel and unusual punishment prohibited by both the state and federal Constitutions. (Cal. Const., art. I, § 17; U.S. Const., 8th and 14th Amends.) We observe that *Feagley* concerned the now amended statutory scheme, wherein MDSO's who were found unamenable to treatment were subject to civil commitment and confinement for an indefinite period in a prison setting without treatment. (14 Cal.3d at pp. 371, 374.) Under the current scheme, civilly committed MDSOs are all subject to periodic reviews of their commitments and are all recipients of treatment. (§ 6300 et seq.) Nevertheless, we need not discuss in detail whether or not we concur with the above mentioned Court of Appeal cases, because, in this case, the trial court did expressly find that appellant was amenable to treatment.[3]

---

[3]At the time of appellant's extension hearing, section 6316.2 provided in relevant part: "(a) A person may be committed beyond the term prescribed by Section 6316.1 only under the procedure set forth in this section and only if such person meets all of the following: [¶] (1) The 'sex offense' as defined in subdivision (a) of Section 6302 of which the person has been convicted is a felony, whether committed before or after July 1, 1977, or is a misdemeanor which was committed before July 1, 1977. [¶] (2) Suffers from a mental disease, defect, or disorder, and as a result of such mental disease, defect, or disorder is predisposed to the commission of sexual offenses to such a degree that he presents a serious threat of substantial harm to the health and safety of others." Section 6316.2 was amended in 1979 to add subdivision (j), which states: "Amenability to treatment is not required for a finding that any person is a person as described in subdivision (a), nor is it required for treatment of such person. Treatment programs need only be made available to such person. Treatment does not mean that the treatment be successful or potentially successful, nor does it mean that the person must recognize his or her problem and willingly participate in the treatment program."

Section 6316 requires that a person cannot be initially committed as an MDSO, unless such person could benefit from treatment. Yet under section 6316.2, a person may be *recommitted* notwithstanding that such person could no longer benefit from treatment. Thus, an MDSO found unamenable to treatment in the initial commitment proceedings must be returned to the criminal court for disposition of the charges against him. When he has served his sentence, he must be released from prison. Whether civil commitment may then follow we do not here determine. But if the person is initially found to be an amenable MDSO, he is subject to recommitment beyond the maximum period he would have served in prison had he originally been found unamenable. Once it is determined that a classification scheme affects a fundamental interest such as liberty, "*the state* must first establish that it has a *compelling* interest which justifies the law and then demonstrate that the distinctions drawn by the law are

## II

■ Appellant next contends that the trial court erred in finding that appellant could benefit from treatment, because there was no substantial evidence supporting such finding. Assuming only that a finding of amenability was required to recommit appellant, such finding must be based upon proof beyond a reasonable doubt. (*People* v. *Compelleebee, supra,* 99 Cal.App.3d 296, 300; *People* v. *Feagley, supra,* 14 Cal.3d 338, 347; *People* v. *Burnick* (1975) 14 Cal.3d 306, 332 [121 Cal.Rptr. 488, 535 P.2d 352].) The task of the reviewing court is to determine whether a reasonable trier of fact could have found that the prosecution sustained its burden of proving that the appellant was amenable to treatment beyond a reasonable doubt. (*People* v. *Compelleebee, supra,* at p. 304; see *People* v. *Reyes* (1974) 12 Cal.3d 486, 496-497 [116 Cal.Rptr. 217, 526 P.2d 225].) The substantial evidence rule is the standard for making this determination. (*Id.*)

Our Supreme Court articulated the substantial evidence rule as follows: "This court must view the evidence in a light most favorable to respondent and presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence. [Citation]. If the circumstances reasonably justify the trial court's findings, reversal is not warranted merely because the circumstances might also be reasonably reconciled with a contrary finding. [Citations.] The test on appeal is whether there is substantial evidence to support the conclusion of the trier of fact; it is not whether guilt is established beyond a reasonable doubt. [Citation.]" (*People* v. *Redmond* (1969) 71 Cal.2d 745, 755 [79 Cal.Rptr. 529, 457 P.2d 321].)

The evidence on the issue of whether appellant could benefit from further treatment at Atascadero came from five psychiatrists, one psychologist and the hospital program director. All those who testified agreed that appellant was still an MDSO; that is, appellant was still a "person who by reason of mental defect, disease, or disorder, is predisposed to the commission of sexual offenses to such a degree that he is dangerous to the health and safety of others." (§ 6300; see § 6316.2,

---

*necessary* to further that purpose." (Italics in original. *People* v. *Olivas* (1976) 17 Cal.3d 236, 251 [131 Cal.Rptr. 55, 551 P.2d 375]; *People* v. *Feagley, supra,* 14 Cal.3d 338, 355.)

We have addressed ourselves to the equal protection argument in *People* v. *Poggi* (1980) *ante,* page 581 [165 Cal.Rptr. 758] and conclude that the section is not unconstitutional.

subd. (a).) Most of the witnesses also agreed that although appellant's prognosis was poor, he could undergo substantial improvement as a result of treatment, especially if he became more cooperative.

Doctor Ronald Markman, a psychiatrist, had examined appellant pursuant to court appointment. He had also reviewed hospital records. Doctor Markman diagnosed appellant as suffering from latent schizophrenia or borderline psychosis which was "mildly controlled" by hospitalization and medication. He testified that appellant "is a serious threat of substantial harm to others based upon an inability to control impulsive thoughts and desires if left on his own in the community." He further stated his belief that appellant's predisposition to commit sexual offenses would continue over the reasonably foreseeable future, possibly to middle age. Very little change had taken place in the last 12 years. Nevertheless, he also testified that a proper application of drug therapy could reduce appellant's predisposition to commit sexual offenses. Proper doses of certain drugs could "assist in the control mechanism within his personality." Such therapy could bring about a long term reduction in appellant's predisposition, not merely a temporary reduction while under the influence of the drug. The likelihood of success for such treatment was 20 or 25 percent if conducted over a period of at least three years.

Dr. Blake Skrdla, a psychiatrist, also examined appellant pursuant to court appointment, and also reviewed appellant's hospital and criminal records. Doctor Skrdla diagnosed appellant as suffering from female pedophilia and paranoid schizophrenia. Female pedophilia, he testified, involved a fixation at a very early level of sexual development, wherein the person's primary sexual interest is in young preadolescent females." [H]is sexual drive and satisfaction is oriented toward experiences with this type of individual." Appellant's dangerous predisposition, Doctor Skrdla testified, was directly attributable to his female pedophilia; the impact of appellant's schizophrenic condition upon his predisposition is not wholly clear. Doctor Skrdla testified that appellant's condition is deeply entrenched. "I think cure would be very difficult in view of the history and it would take a long period of time and it would require, I believe, further inpatient supervision, care, and treatment." He opined that the problem could continue until appellant reached his 50's. Finally he said that in his opinion appellant had a 20 percent chance that he would no longer be predisposed to the commission of sexual offenses as a result of continued treatment.

Doctor Franklin Drucker, a psychiatrist, also testified as to appellant's condition, based upon an examination of appellant. Doctor Drucker testified that appellant presented a danger to the health and safety of others and that, as a result of mental disease or defect, he is predisposed to commit sexual offenses against young girls. The doctor also testified that this condition of appellant had existed for a very long time, throughout repeated periods of hospital commitments for sexual offenses. Doctor Drucker testified that appellant told him that his commitment had resulted from his molestation of and intercourse with a four-year-old girl; appellant also told him about molestations of two other small girls before that. The doctor opined that the probability of "behavior control or remission" is relatively low; if appellant were hospitalized for another five years, it would be highly unlikely that appellant's predisposition to commit sexual offenses would be eliminated. In his view, no treatment alternative of which he was aware would have a remarkable effect on appellant, even if appellant were receptive to treatment.

A staff psychiatrist at Atascadero, Dr. Austin Bennett, had examined appellant in 1976 and had recently reviewed appellant's medical history. Dr. Bennett testified that during appellant's treatment at the hospital, appellant had begun to display some insight into his problems, he had become more communicative and less violent. These changes indicated perhaps a 15 percent improvement in his condition. Dr. Bennett attributed this improvement in part to drug therapy at the hospital and in part to appellant's own efforts. Despite appellant's increased intellectual insights, appellant continued to display poor judgment and still suffered from the disorders which predisposed him to commit sexual offenses. Hence, the bulk of the improvement was "temporary" and not indicative of a permanent remission. Considering the number of relapses, Dr. Bennett doubted that appellant's predisposition would be "contained" until "male menopause."

He, nevertheless, testified that appellant's pathological sexual impulses could be substantially reduced if he accepted treatment and practiced controlling those impulses. Dr. Bennett doubted that there was much chance for such improvement unless defendant remained in a controlled hospital environment, such as Atascadero, where people would work hard with him to increase insight and to control impulse behavior. Appellant's recent improvement was a first step.

Doctor Katherine Renear, a psychologist, had worked with appellant for six months in group therapy. She testified that during the time she worked with appellant he appeared to make considerable improvements. For example, she regarded appellant's decision to take his industrial therapy assignment running the elevator, where he would encounter many women, as a real improvement. She also regarded his decision to retake the sex education class as a considerable improvement, as was his attendance at black project meetings to work on some of his feelings about race. She also stated her belief that appellant was more likely to talk with adult women now, which appeared to be an improvement. Yet, she acknowledged that he also appeared to rapidly lose ground on several occasions. She indicated that appellant resisted efforts to improve his condition. She concluded her testimony by stating that, "I don't see any evidence that Mr. Martin will be able to live in the free community unsupervised, but I couldn't guarantee that there won't ever in the future be any such evidence."

Alan Arebalo, program director at Atascadero, testified that he has known appellant throughout appellant's period of commitment at the hospital; he testified that no significant amount of behavioral change had taken place during that period. Mr. Arebalo further stated that it did not seem likely that appellant would ever improve enough to return to society in an unstructured setting; however, appellant could improve enough to function in a highly structured community based program, assuming such a program might be implemented in the future. Up to the present, however, appellant had not demonstrated that he has or will have the motivation to participate in treatment to the extent that he will significantly improve.

Dr. Charles Harmon, a psychiatrist, testified that his examination of appellant indicated that appellant had a moderately severe disorder with neurological signs which indicate a poor prognosis. His long record of treatment at Atascadero and other facilities show that appellant "had not responded favorably to any of the treatments at Atascadero or at previous institutions to such an extent that it significantly alleviated his mental condition." Nevertheless, the psychiatrist stated that it would be inappropriate to consider appellant unamenable to treatment. He said that in his opinion *unamenable* sex offenders were those who were physically and neurologically healthy, yet had a history of sex offenses. Appellant, to the contrary, could derive benefit from hospitalization because he had a mental disorder for which treatment was appropriate and possibly effective.

We believe that the above evidence is sufficient for a reasonable trier of fact to believe beyond doubt that appellant could benefit from treatment. The testimony, it is true, shows that appellant's predisposition to force sexual relations upon preadolescent girls is difficult to remove through treatment, and that appellant has resisted attempts to improve his condition. Nevertheless, the testimony also shows that appellant's disorders are treatable. Further, there was testimony that appellant had shown signs of increased susceptibility to treatment: he was voluntarily participating in certain programs; he was less violent and more communicative. Finally, there was substantial evidence in the testimony that if appellant became more cooperative, he could substantially improve his condition.

In order to establish that appellant could benefit from treatment, the state need not show that appellant will be cured; substantial improvement is, we believe, a sufficient benefit. Nor need the state prove that improvement is certain to occur; it is sufficient if there is a reasonable likelihood of substantial improvement.

Finally, the fact that appellant resists treatment does not necessarily mean that he is unamenable to treatment. First, the evidence showed that appellant had displayed signs of being more receptive to treatment. Second, we believe that it would be patently unwise to recognize a right in favor of the MDSO to reject potentially helpful treatment. As recently stated in *People v. Lakey, supra,* 102 Cal.App.3d 962, at p. 973: "If a patient can render himself unamenable to treatment by simply refusing to cooperate in therapy programs set up for his benefit, the state's fundamental interest in treating and, hopefully, curing those persons with dangerous mental disorders would be frustrated. We are inclined to agree with the trial judge who stated, 'the People of this State have an entitlement, in view of that which has occurred in Mr. Lakey's life and in the life of his victim, to insist that he, so long as there are programs available for his treatment at Atascadero, cooperate in—those programs. . . .'"

### III

We now turn to appellant's contention that section 6316.2 is unconstitutionally vague. At the time of appellant's recommitment hearing section 6316.2, subdivision (a)(2), required a finding that the person sought to be recommitted "suffers from a mental disease, defect, or disorder, and as a result of such mental disease, defect, or disorder, is

predisposed to the commission of sexual offenses to such an extent that he presents a serious threat of substantial harm to the health and safety of others." Appellant asserts that the terms "mental disease, defect, or disorder," "predisposed," "serious threat," and "substantial harm" are not sufficiently definite to form a basis for involuntary commitment. We reject this contention and concur with *People* v. *Lakey, supra,* at page 976, where the court held that section 6316.2 withstands the challenge of vagueness.

"In ascertaining whether a statute is vague 'The required meaning, certainty and lack of ambiguity may appear on the face of the questioned statute or from any demonstrably established technical or common law meaning of the language in question. [Citation.]' (*People* v. *Kirk* (1975) 49 Cal.App.3d 765, 769...)" (*People* v. *Lakey, supra,* at p. 976.)

The term "mental disorder" has a demonstrably established technical meaning. Diagnoses of mental disorders are made pursuant to the diagnostic nomenclature of the Diagnostic and Statistical Manual of Mental Disorders of the American Psychiatric Association (1968) (See Cal. Admin.Code, tit. 9, § 813.) Hence the term "disorder" is not unconstitutionally vague.

The remaining terms challenged as vague each have a meaning commonly understood by people of reasonable intelligence. The term "predisposed" means "inclined," "susceptible," or "tending." As used in the statute, the term is used to convey that the person's mental disorder creates in him a *tendency* to commit the wrongful acts. The statute additionally requires that the inclination or tendency be sufficiently strong so as to create "a serious threat" of "substantial harm" to others. The term "serious threat" connotes a high degree of risk, rather than a mere possibility. "Substantial harm" reasonably conveys serious rather than trivial, harm to other persons. We observe that in *People* v. *Kirk* (1975) 49 Cal.App.3d 765, 769 [122 Cal.Rptr. 653], the term "dangerous" as used in section 6300 was held sufficiently definite to withstand a vagueness challenge; the terms presently challenged have more clarity and definiteness of meaning than the term "dangerous." We conclude that the terms challenged in section 6316.2 are not so vague as to violate appellant's due process rights.

■ Appellant also argues that the prediction that a person may in the future engage in conduct dangerous to others is not sufficiently reli-

able to justify a deprivation of liberty. We recognize that liberty is a fundamental interest, and that, under the present state of the art, experts cannot predict with certainty whether persons will engage in dangerous conduct. Yet, we also recognize that persons subject to recommitment hearings pursuant to section 6316.2 have previously committed one or more sexual offenses. (*Id.* subd. (a)(1).) Further, such persons cannot be recommitted unless they are shown to still have a mental disorder which predisposes them to commit sexual offenses. (*Id.* subd. (a)(2).) We believe that a trier of fact can make reasonable assessments, based upon the evidence, whether previous offenders *currently* present a high risk of serious harm to others by reason of their continuing mental disorder. Appellant's fundamental interest in liberty was adequately protected by requiring that the standard of proof beyond a reasonable doubt be utilized in establishing whether the person presents such risk. The compelling interest in protecting society against sexually motivated injury and in providing beneficial treatment for such disordered persons should not be sacrificed by requiring a certainty of prediction which is currently impossible to attain.

■ Appellant also argues that due process always demands that a prediction of dangerousness be corroborated by a *recent overt act* in indicating dangerousness. We reject this contention. We need not address the question of whether such a requirement should be imposed in some contexts; we are satisfied that no such requirement should exist in the present one. Due process does not require that the absurd be done before a compelling state interest can be vindicated. As in the present case, an MDSO may have a predisposition to commit a specific type of sexual offense—one that cannot, as a practical matter, be committed during confinement.[4] Here, appellant's predisposing disorders have repeatedly driven him to force sexual relations upon preadolescent girls (the last one was four years old). Atascadero necessarily provides small opportunity for appellant to act out his current drives with such girls. Must appellant therefore be released notwithstanding the existence of other strong evidence of his continuing disorder and dangerous disposition? Our answer is "no."

---

[4]Appellant has cited two cases which declare that in civil commitment proceedings, a finding that a person is a danger to himself or others must be supported by evidence of a recent overt act. (*Lynch* v. *Baxley* (N.D. Ala. 1974) 386 F.Supp. 378, 391; *Lessard* v. *Schmidt* (E.D. Wis. 1972) 349 F.Supp. 1078, 1093.) Neither of these cases dealt with recommitment proceedings against one whose initial commitment followed the commission of a sexual offense; nor did they concern one who was predisposed to commit a specific pattern of dangerous conduct which could not be acted out while in confinement. We therefore find them unpersuasive in the present case.

Appellant points to section 5300 and 5304 of the Lanterman-Petris-Short Act (LPS), California's general civil commitment statute. These code sections provide for imposition of 90-day civil commitments after the expiration of a 14-day commitment imposed pursuant to sections 5254 and 5260. He asserts that these statutes require a finding of a "recent overt act" as prerequisite to a 90-day recommitment. He urges that this finding should also be required in MDSO recommitment proceedings under section 6316.2, because persons recommitted under LPS are similarly situated with MDSO's recommitted under section 6316.2. We conclude, however, that appellant's argument is based upon a misreading of sections 5300 and 5304. These code sections authorize extended confinements of 90 days if it is found that (1) the person as a result of mental disorder, presents an imminent threat of substantial physical harm to others (§§ 5300, subd. (a)-(b), 5304, subd. (a)-(b)); and (2) the person threatened, attempted, or actually inflicted physical harm upon the person of another after having been taken into custody for evaluation and treatment. (§ 5300, subd. (a), § 5304, subd. (a)); *or* (3) the person had attempted or inflicted physical harm upon another, and that act resulted in his being taken into custody. (§§ 5300, subd. (b), 5304, subd. (b.) These code sections thus make clear that a recent overt act of violence is unnecessary where, as here, the initial confinement resulted from the commission of such an act. Thus, the alleged differential treatment of those committed under sections 5300 and 5304 of LPS versus those committed under section 6316.2 of the MDSO legislation does not exist.

The judgment is affirmed.

Kaus, P. J., and Ashby, J., concurred.