[No. D004523. Fourth Dist., Div. One. Jan. 29, 1988.]

THE PEOPLE, Plaintiff and Respondent, v.
MORRIS LEE DASHER, Defendant and Appellant.

COUNSEL

Stephen J. Perrello, Jr., under appointment by the Court of Appeal, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Steve White, Chief Assistant Attorney General, Leslie B. Fleming and Lilia E. Garcia, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

TODD, J.—We deal here with the mechanism to extend the commitment of a mentally disordered sex offender (MDSO). Morris Lee Dasher challenges his latest recommitment as an MDSO on constitutional grounds and on the basis of instructional error.

### FACTS

On August 6, 1973, Dasher pled guilty to one count of forcible oral copulation of a 13-year-old girl and one count of kidnapping (Pen. Code, §§ 288a, 207). On September 6, 1973, the superior court found Dasher to be an MDSO, and, pursuant to former Welfare and Institutions Code[1] section

---

[1] All statutory references are to the Welfare and Institutions Code unless otherwise specified.

Section 6316.2 and associated MDSO laws were repealed by Statutes 1981, chapter 928, section 2, page 3485; however, they remain applicable to persons previously committed as mentally disordered sex offenders and subject to recommitment. (*Baker* v. *Superior Court*

6316, he was committed to the state Department of Mental Health for confinement in Atascadero State Hospital. On September 26, 1977, the community release board fixed Dasher's maximum date of confinement as May 5, 1979. In 1979, 1980, 1982 and 1984, Dasher's commitment was extended pursuant to section 6316.2.

Most recently, on January 26, 1986, the district attorney filed a petition to extend Dasher's commitment as an MDSO pursuant to section 6316.2 for an additional two years. The superior court appointed psychiatrists to examine Dasher (§§ 6316.2, subd. (e), 6307), and thereafter a jury trial was held.

The trial court took judicial notice of the following: (1) Dasher's commission of statutory rape in 1966 (he later married the victim); (2) Dasher's guilty plea in 1973 to forcible oral copulation with a child under the age of 15 and more than 10 years younger than he; and (3) Dasher's guilty plea to kidnapping the same girl involved in the oral copulation.

The prosecution's sole witness was Dr. Paul Bramwell, Atascadero's program director and a staff psychologist. Bramwell, who has known Dasher for 11 to 13 years and had daily contact with him, opined Dasher is still mentally ill: (1) he is schizophrenic, undifferentiated type; (2) he has auditory hallucinations, such as women making derogatory remarks about him; (3) he has no insight as to his psychological problems; (4) he does not obey reasonable staff requests and has poor judgment; (5) he engages in bizarre behavior, such as inferred by the staff when they found feces in his night stand.

Bramwell also opined that Dasher is predisposed to commit sexual offenses which involve threat, force and violence. He based this opinion on Dasher's aggressive relationship with his wife, his poor relations with women generally, his history of aggressive behavior and aggressive sexuality, the commitment offense, his assaultive and threatening behavior at the hospital and the hospital staff's inability to deal with his sexual problems.

In one incident at Atascadero, he began to unfasten his pants while telling a female staff member: "I got a rash, bitch. If you want to see it bitch, you want to see it." The next day, he took a magazine that belonged to another patient. When a female technician tried to retrieve the magazine, Dasher became abusive and repeatedly told her: "Keep that Goddamn hall card, bitch, whore, dog, you can stick it up your pussy, as you want it anyway."

(1984) 35 Cal.3d 663, 667-670 [677 P.2d 219].) For convenience, we refer to the repealed sections as if they were not repealed.

In the previous 18 months, Dasher physically assaulted persons 11 times. On 53 different occasions he threatened other patients. Verbal altercations between Dasher and staff occurred about once every one to two days.

Testifying for the defense, Dr. Robert Slatter, who was Dasher's psychiatrist for 15 months during 1981 and 1982, and for a year between 1984 and 1985, questioned whether Dasher would reoffend with a sex crime. Slatter testified he could not say "yes" or "no" when asked if Dasher is predisposed to commit sex offenses. Slatter said Dasher could become sexually aggressive under certain circumstances. Slatter said Dasher is generally violent, aggressive and a danger to others, but the sexual aspect of his behavior does not override the nonsexual aspect of his behavior. While Dasher's sexual remarks are threatening, one cannot tell if Dasher is sexually aroused when he utters them, Slatter testified.

Finally, Dr. Michael Jaffe, a San Diego psychiatrist who interviewed Dasher at the San Diego jail for one and one-quarter hours, opined Dasher was not predisposed to the commission of sexual offenses. Jaffe, however, has had a limited practice with sex offenders and had never treated a pedophile.

The jury returned a verdict that Dasher was still a mentally disordered sex offender. The trial court recommitted Dasher to Atascadero for a period of two years to May 5, 1988.

### DISCUSSION

### I

Dasher contends it was error for the trial court not to instruct the jury on a definition of "sexual offense" within the meaning of section 6316.2. The section provides in pertinent part: "(a) A person may be committed beyond the term prescribed by Section 6316.1 only under the procedure set forth in this section and only if such person meets all of the following:

"(1) The *'sex offense'* as defined in subdivision (a) of Section 6302 of which the person has been convicted is a felony, whether committed before or after July 1, 1977, or is a misdemeanor which was committed before July 1, 1977.

"(2) Suffers from a mental disease, defect, or disorder, and as a result of such mental disease, defect, or disorder, is predisposed to the commission of

*sexual offenses* to such a degree that he presents a substantial danger of bodily harm to others." (Italics added.)

Section 6302, which deals with certification for hearing and examination of potential MDSOs after conviction, provides in part: "(a) When a person is convicted of any sex offense, the trial judge, . . .

"As used in this section the term 'sex offense' means any offense for which registration is required by Section 290 of the Penal Code; or any felony or misdemeanor which is shown by clear proof or the stipulation of the defendant to have been committed primarily for purposes of sexual arousal or gratification." (Italics added.)

Dasher's argument is premised on the theory that "sexual offense" as used in section 6316.2, subdivision (a)(2), is synonymous with "sex offense" as defined in section 6302, subdivision (a). The premise is wrong.

First, on the basis of statutory interpretation, we conclude the Legislature had a reason for using the term "sexual offense" rather than "sex offense" in section 6316.2, subdivision (a)(2). "It is an elementary rule that a statute should be construed so that 'effect [is] given, if possible, to every word, clause and sentence of a statute.'" (*Flint* v. *Sacramento County Employees' Retirement Assn.* (1985) 164 Cal.App.3d 659, 665-666 [210 Cal.Rptr. 439], citing 2A Sutherland, Statutory Construction (4th ed. 1984) § 46.06, p. 104; fn. omitted.) Surely, the Legislature intended a specific definition of "sex offense" because it provided one. It presumably was aware the term "sexual offense" was used in section 6316.2, subdivision (a)(2), in discussing a defendant's predisposition to commit offenses. Had it intended section 6316.2, subdivision (a)(2), to include the specific definition of "sex offense" as defined in section 6302, subdivision (a), we can only assume it would have used "sex offense" rather than "sexual offense."

Moreover, on substantive grounds we disagree with Dasher. In section 6302, subdivision (a), "sex offense" refers to the underlying crime upon which the defendant originally was convicted. ▪ ▪▪▪▪ ▪ That "sex offense" is the basis for starting a new proceeding to determine if the defendant is an MDSO and represents a danger to the public.[2]

The definition of MDSO is provided in section 6300: "As used in this article, 'mentally disordered sex offender' means any person who by reason

---

[2] The MDSO body of laws was intended as a sentencing alternative designed to (1) protect the public from the violent propensities of certain mentally disordered sex offenders by confining them until they no longer were a danger to society and (2) eliminate their antisocial compulsions by care and treatment. (*People* v. *Oglesby* (1977) 67 Cal.App.3d 34 [135 Cal.Rptr. 640].)

of mental defect, disease, or disorder, is predisposed to the commission of sexual offenses to such a degree that he is dangerous to the health and safety of others. . . ."

In a sense, Dasher is mixing apples and oranges. *"Sex offense"* as used in section 6302, subdivision (a), is a narrowly defined group of crimes that serves as a trigger for commencement of separate proceedings under the MDSO laws. *The predisposition to commit "sexual offenses"* is part of the makeup of an MDSO. A finding that the defendant has this predisposition is a requirement for commitment as an MDSO, and, in this case, for extension of the MDSO commitment.

In *Specht v. Patterson* (1967) 386 U.S. 605 [18 L.Ed.2d 326, 87 S.Ct. 1209], the United States Supreme Court analyzed the Colorado scheme of laws to deal with sex offenders: "The Sex Offenders Act does not make the commission of a specified crime the basis for sentencing. It makes one conviction the basis for commencing another proceeding under another Act to determine whether a person constitutes a threat of bodily harm to the public, or is an habitual offender and mentally ill. That is a new finding of fact [citation] that was not an ingredient of the offense charged. The punishment under the second Act is criminal punishment even though it is designed not so much as retribution as it is to keep individuals from inflicting future harm. [Citation.]" (*Id.* at pp. 608-609, fn. omitted [18 L.Ed.2d at p. 329].)

In *People v. Burnick* (1975) 14 Cal.3d 306 [535 P.2d 352], our Supreme Court said the above analysis also applies to California's mentally disordered sex offender law. (*Id.* at p. 316.) The *Burnick* court noted the United States Supreme Court analysis pointed out: "[T]he purpose of the commitment proceeding was to determine whether the defendant 'constitutes' a danger to others or 'is' a mentally ill habitual offender. That determination, said the court, 'is a new finding of fact . . . that was not an ingredient of the offense charged.'" (*Ibid.*, fn. omitted)

■ Having concluded that Dasher is wrong in his contention that "sexual offense" is synonymous with "sex offense," we still must address whether it was error not to instruct the jury on the definition of "sexual offense."

■ The answer revolves around whether "sexual offense" has a technical meaning which jurors of average intelligence would not know: "A trial court has no *sua sponte* duty to give amplifying or clarifying instructions in the absence of a request where the terms used in the instructions given are 'commonly understood by those familiar with the English language'; it does

have such a duty where the terms have a 'technical meaning peculiar to the law.' [Citations.]" *(People* v. *Kimbrel* (1981) 120 Cal.App.3d 869, 872 [174 Cal.Rptr. 816].)

▇ Unlike "sex offense," which has a technical meaning (see § 6302, subd. (a)), the term "sexual offense" does not. People of average intelligence will understand the term "sexual offense" to mean illegal sexual conduct. In light of this common, ordinary meaning, no definitional instruction was required. Ordinary words and phrases in statutes require no definition because they are presumed to be understood by jurors. *(People* v. *Jones* (1971) 19 Cal.App.3d 437, 447 [96 Cal.Rptr. 795].)

Furthermore, Dr. Bramwell testified about the meaning of the term: "If I might, it's my feeling that the sexual offenses we're talking about are things that involve force and threat, that it's with an uncooperative individual, a victim, and someone who perpetrates these things of them.

"So, there is an element of violence connected with these things.

"And I've defined violence . . . as characterized by the application of overt threat of force which is likely to result in injury to people.

"Now, I see dangerousness is the prediction of that violence. . . ."

With respect to the meaning of predisposition, Bramwell and the prosecutor engaged in the following colloquy:

"[Prosecutor]: Can you tell us what you mean, what your feeling is when you use the word 'predisposed,' what does that mean to you?

"[Bramwell]: Well, it's that the qualities or the characteristics that might thrust that individual to making threats or acting out in that violent sexual way. Those are in the individual at that time. [¶] It's analogous in my mind to having a gun that you put the ammunition in the gun. It hasn't been— someone then only needs to pull the trigger for it to fire but it's all there inside the individual. It predisposes him to do that kind of thing.

"[Prosecutor]: Of course, I take it you could have a loaded gun that never fired and someone could be predisposed to commit sexual offenses and yet never commit another sexual offense?

"[Bramwell]: Yes, ma'am. Very much so."

The jury, which was instructed pursuant to CALJIC No. 2.80, was entitled to rely on an expert's knowledge and opinion on the meaning of terms

used in the MDSO statute. In this field, testimony by mental health experts often will be the only evidence presented on the probative issues. In this context, there was no need to provide a definitional instruction.

■ Dasher also contends "sexual offense" is unconstitutionally vague. He urges us to consider a constitutional attack on the term "sexual offenses" if we reject his primary argument based on instructional error.

Vagueness attacks on section 6316.2 have been raised before and rejected. The terms "mental disease, defect, or disorder," "predisposed," "serious threat," and "substantial harm" have been found not to be vague in the context of the MDSO statute. (See *People* v. *Martin* (1980) 107 Cal.App.3d 714, 724 [165 Cal.Rptr. 773]; *People* v. *Henderson* (1980) 107 Cal.App.3d 475, 491-492 [166 Cal.Rptr. 20]; *People* v. *Lakey* (1980) 102 Cal.App.3d 962, 975-976 [162 Cal.Rptr. 653].)

In ascertaining whether a statute is vague, "[t]he required meaning, certainty and lack of ambiguity may appear on the face of the questioned statute or from any demonstrably established technical or common law meaning of the language in question [citation]." (*People* v. *Kirk* (1975) 49 Cal.App.3d 765, 769 [122 Cal.Rptr. 653].) In *People* v. *Kirk* the term "dangerous" as used in section 6300 was found not to be so vague as to violate due process. We are satisfied that the term "sexual offense" in section 6316.2 is (1) at least as clear as the other terms in the statute that have judicially passed muster on a vagueness test and (2) subject to a more "demonstrably established technical . . . meaning" than the other terms. (See *People* v. *Lakey, supra,* 102 Cal.App.3d at p. 976.) The term "sexual offense" is not unconstitutionally vague.

## II

Dasher contends the trial court erred by allowing into evidence the following: a letter he wrote threatening to kill a superior court judge; a police report detailing the commitment offense, and an October 1985 hospital report recommending recommitment. Dasher also contends the trial court erred in allowing oral testimony regarding other offenses committed by Dasher.

Evidence Code section 801, subdivision (b) provides that an expert may base his opinion on matters ". . . perceived by or personally known to the witness or made known to him at or before the hearing, whether or not admissible, that is of a type that reasonably may be relied upon by an expert in forming an opinion upon the subject to which his testimony relates, unless an expert is precluded by law from using such matter as a basis for

his opinion." The letter threatening to kill a judge was admitted to support Bramwell's expert opinion that Dasher was violent. During Bramwell's testimony, the trial court instructed the jury as follows: "Sometimes during the trial I find it necessary, and by request of counsel, to instruct you.

"The fact that this gentleman, that doctor is giving you are [*sic*] only given to you as a basis that's used to express his opinion. He has an opinion about something. He must base it on certain things.

"These things that—what did you say, he shot his mother; . . .

"That these facts are not necessarily proven." The court went on to say: "But they are facts that are used by this witness, this expert witness to substantiate his opinion." Dasher's trial counsel did not object when Bramwell read the contents of the letter into evidence. ■ Defense counsel, however, did object on the basis of Evidence Code section 352 to the letter being introduced into evidence. The objection was overruled and the letter was admitted—not for the truth of the matter stated, but to substantiate Bramwell's opinion that Dasher continued to demonstrate aggressive, violent tendencies towards others. The trial court, at the conclusion of the trial, instructed the jury pursuant to a modified CALJIC No. 2.09 (Evidence Limited as to Purpose).[3] As the contents of the letter had already been read into evidence, we fail to see any undue prejudice from admitting the letter itself. If there was any error, it was harmless. (*People* v. *Watson* (1956) 46 Cal.2d 818, 835 [299 P.2d 243].)

■ The trial court permitted an eight-page report from Atascadero recommending recommitment to be introduced into evidence over objection by defense counsel and in the face of the court's own acknowledgement that a proper foundation of the document as a business record had not been laid. The district attorney used the report to impeach a portion of Dr. Slatter's testimony. We find no error with respect to this use of the report. However, we agree the challenged report should not have been admitted into evidence because it constituted hearsay and there was no showing it came within the business records exception to the hearsay rule. Nonetheless, we cannot conclude that it is reasonably probable a result more favorable to Dasher

---

[3] The jury was instructed that "[c]ertain evidence . . . was admitted for a limited purpose. This includes evidence of facts relied upon by expert witnesses as a basis for their opinions regarding Mr. Dasher's condition, and reports of medical and police personnel concerning Mr. Dasher's offense in 1973. [¶] At the time this evidence was admitted you were admonished that it could not be considered by you for any purpose other than the limited purpose for which it was admitted. [¶] The purpose was to determine the factual basis and reasonableness of expert opinions. [¶] You are again instructed that you must not—instructed that you must not consider such evidence for any purpose except the limited purpose for which it was admitted."

would have been reached in the absence of the error. (See *People* v. *Watson, supra,* 46 Cal.2d at p. 836.) The Atascadero doctors testified as to the main contents of the report; hence, this information had been communicated to the jury.

■ The district attorney introduced the police report to impeach Dr. Jaffe. Dr. Jaffe testified that in his opinion the 1973 offense of forcible oral copulation on the 13-year-old girl was not a sexually violent offense. Jaffe said "nothing actually happened with the girl." The trial court, in allowing the police report to be admitted into evidence, reasoned: "How else can the jury compare the police report and Dr. Jaffe's statement that, quote, 'Nothing happened.' " The trial court accepted the district attorney's argument the police report was not being offered to prove the truth of its content but to show Dr. Jaffe's bias. We have no quarrel with portions of the police report being used during Dr. Jaffe's testimony for impeachment; however, we disapprove of the uncleansed police report being sent into the jury room. However, again we must conclude the introduction of inadmissible hearsay evidence does not require reversal. It is not reasonably probable the jury would have reached a result more favorable to Dasher had the police report not been introduced into evidence.

Most of Dasher's assignments of error concerning other crimes evidence revolve around Dr. Bramwell's testimony. Bramwell opined Dasher had a history of poor relations with females. The psychologist recounted, among other things, Dasher beat and shot his mother. Defense counsel objected it was hearsay and asked for a limiting instruction. The trial court complied, telling the jury "these facts are not necessarily proven," but were relied upon by the witness "to substantiate his opinion." Bramwell went on to relate Dasher beat his wife, was committed to the California Youth Authority for burglary, was charged with shoplifting, battery and auto theft, and had sexually assaulted or made sexual overtures to fellow patients at Atascadero. During Dr. Jaffe's testimony, the district attorney brought out that Dasher had been arrested for forcible rape of a 16-year-old girl. The district attorney used a transcript of a previous trial at which Dasher admitted the arrest. Defense counsel did not object to the use of the partial transcript to impeach Dr. Jaffe.

■ "The admissibility of evidence will not be reviewed on appeal in the absence of a proper objection in the trial court." (*People* v. *Johnson* (1967) 253 Cal.App.2d 396, 400 [61 Cal.Rptr. 225]; see also Evid. Code, § 353.) Dasher has waived any right to raise the issue of improperly admitted evidence of other crimes.

## III

Dasher contends the trial court erred by inaccurately instructing[4] the jury on the definition of conservatorship. Dasher says he was prejudiced by the trial court's failure to describe the power of a conservator to confine a conservatee against his will. This assignment of error is meritless.

■■■ The trial court was not required to instruct on the powers of a conservator or on a conservatorship as a lesser restrictive alternative to an MDSO extension. A conservatorship was not an issue in this proceeding. The sole triable issue was whether Dasher suffers from a mental disease, defect, or disorder, which predisposed him to commit sexual offenses to such a degree that he presented a substantial danger of bodily harm to others. (See § 6316.2, subd. (a)(2).)

## IV

■■■ Finally, Dasher challenges the constitutionality of the recommitment scheme under section 6316.2 because it does not require a showing that the defendant is amenable to treatment.[5] Dasher contends the statute therefore violates due process and equal protection guarantees of the California and United States Constitutions.

As acknowledged by Dasher, this court considered the identical issue in *People* v. *Roberts* (1981) 123 Cal.App.3d 684 [177 Cal.Rptr. 11], and found section 6316.2 was constitutional. Dasher has presented nothing to persuade us to reevaluate our reasoning or conclusion in *Roberts*.

---

[4] During the cross-examination of Dr. Bramwell, the witness conceded that a staff psychiatrist had once recommended a conservatorship for Dasher. The discussion of a conservatorship and the staff conclusion that it was inappropriate continued during the redirect examination. The trial court interrupted Bramwell's testimony to explain the nature of a conservatorship to the jury. After giving a simplified explanation, the court asked the prosecutor and the defense counsel if they wanted to add anything to its explanation. Both said they did not.

[5] Section 6316.2, subdivisions (i) and (j) provide: "(i) Any commitment to the State Department of Mental Health under this article places an affirmative obligation on the department to provide treatment for the underlying causes of the person's mental disorder."

"(j) Amenability to treatment is not required for a finding that any person is a person as described in subdivision (a), nor is it required for treatment of such person. Treatment programs need only be made available to such person. Treatment does not mean that the treatment be successful or potentially successful, nor does it mean that the person must recognize his or her problem and willingly participate in the treatment program."

## DISPOSITION

Order of recommitment affirmed.

Butler, Acting P. J., and Thaxton, J.,* concurred.

A petition for a rehearing was denied February 25, 1988, and appellant's petition for review by the Supreme Court was denied May 19, 1988.

* Assigned by the Chairperson of the Judicial Council.