Filed 7/25/23

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>J. G.A.,<br><br>        Defendant and Appellant. | A164980<br><br>(Mendocino County Super. Ct. No. MCUK-CRCR-10-10581-002) |

J. G.A. (G.A.) appeals from an order extending his commitment under Welfare and Institutions Code section 6500 et seq.,[1] which permits the involuntary commitment of persons with a developmental disability if they are found to be "a danger to self or others."  (§ 6500, subd. (b)(1).)  Among other things, G.A. contends (1) section 6500 violates due process because it allows a court to order a commitment without proof of a recent overt act; and (2) the evidence was insufficient to support the finding that he posed a danger to himself or others.

As both parties acknowledged during oral argument, under section 6500, subdivision (b)(1)(A), a commitment order expires on the one-year anniversary of the date of the commitment order.  (*People v. Nolasco* (2021) 67 Cal.App.5th 209, 218.)  As such, G.A.'s commitment order expired

---

[1]     All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

1

on April 1, 2023, and the matter is technically moot.  This case, however, presents important and recurring issues of law concerning the applicability of due process principles to section 6500 and the sufficiency of evidence supporting a commitment.  Accordingly, we will discuss these particular issues to provide guidance, then dismiss the appeal as moot.  (See, e.g., *People v. Sweeney* (2009) 175 Cal.App.4th 210, 215, 225–226 (*Sweeney*).)

For the reasons that follow, we conclude section 6500 does not violate due process by dispensing with the need for proof of a recent overt act of dangerousness.  (See § 6500, subd. (b)(3).)  We also conclude substantial evidence does not support the trial court's finding of G.A.'s danger to others because it was based on the testimony of an expert witness whose opinion relied on unsupported assumptions fact.

There is, however, significant ambiguity as to the meaning of the statutory term "danger to self."  (§ 6500, subd. (b)(1).)  At bottom, the question is an important one of statutory interpretation.  But the parties have not adequately briefed the issue, and our legal research has found conflicting indicia of the Legislature's intent.  Considering the seriousness of the civil liberty and safety interests at stake, we deem it best to leave construction of the statute to a future case with adequate briefing.  To that end, we note our observations on these issues, with the contemplation that justice partners or community providers who may be interested in weighing in on these issues might provide their input as amici curiae in future proceedings.

## FACTUAL AND PROCEDURAL BACKGROUND

In 2001, the People charged G.A. with lewd acts with a child under 14 years old (Pen. Code, § 288, subd. (a)), sexual battery by restraint (*id.*, § 243.4, subd. (a)), and false imprisonment (*id.*, § 236).  After finding G.A.

2

incompetent to stand trial, the trial court suspended criminal proceedings pursuant to Penal Code section 1368 and committed G.A. to the Redwood Coast Regional Center pursuant to Penal Code section 1370.1. G.A. never regained competency, but he returned to the city where his parents lived and received services through the Redwood Coast Regional Center up until 2008.

In February 2010, the People filed a felony complaint charging G.A. with kidnapping with the intent to sexually assault, rape, annoy, or molest a child under the age of 10 years old (Pen. Code, § 209, subd. (b)), and sexual intercourse or sodomy with a child under the age of 10 years old (*id.,* § 288.7, subd. (a)). After finding G.A. incompetent to stand trial, the trial court held a commitment hearing pursuant to section 6500 et seq. At that hearing, G.A. stipulated to the evidence presented and made no argument that the evidence failed to satisfy any constitutional or statutory requirements for commitment. Over the years leading up to the recommitment petition filed in 2020, G.A. submitted to various reports being considered as evidence and either explicitly or impliedly agreed with the extension of his commitment. Though G.A. challenged his 2020 recommitment, his appeal was dismissed as moot. (*People v.* [*J.*] *G.A.* (Sept. 29, 2022, A162897) [nonpub. opn.].)

In August 2021, the People filed the underlying petition to extend G.A.'s commitment. The People alleged that G.A. suffers from moderate developmental disability, that he represents a danger to himself or to others, and that he was charged with the aforementioned sex offenses in 2010.

A court trial on the petition was held in January 2021. At the beginning of the trial, counsel for G.A. moved to exclude any evidence that might violate *People v. Sanchez* (2016) 63 Cal.4th 665 (*Sanchez*). The trial court indicated counsel should make any necessary objections when and if such evidence were proffered. The People moved for judicial notice of the

charges filed against G.A. in 2001 and 2010, but the court deferred ruling on the motion. The following two witnesses were then called to testify.

Izaak Talamaivao is an employee at "Radiant Living" who has worked with G.A. weekly since 2017. According to Talamaivao, G.A. can care for his hygiene by himself, but he probably could not use a thermometer or call 911 in an emergency. G.A. can describe what is on a television screen but cannot remember it or fully grasp the content. G.A. does not know his own telephone number or address. Two to three years prior, G.A. wandered away from a gym and was found at a nearby bus stop without his caregiver.

Dr. Albert Kastl, a psychologist, testified that he evaluated G.A. in November 2021, and about eight previous times starting in 2001. When conducting his recent evaluation, Dr. Kastl reviewed prior reports and evaluations, including some from other providers. His testing of G.A.'s I.Q. resulted in a score of 42, which was similar to prior evaluations. This score indicated G.A. is very significantly impaired and has a "moderate intellectual disability," a fixed and untreatable diagnosis. Based on tests and interviews, Dr. Kastl opined that G.A. cannot perform basic daily skills without supervision and guidance, and that he is impulsive due to cognitive limitations and emotional factors. Dr. Kastl did not recall reviewing G.A.'s criminal records but was familiar with his criminal cases from reading unspecified documents. When asked if he was familiar with G.A.'s 2010 charges, Dr. Kastl responded affirmatively and stated those charges arose from G.A. allegedly offering two young girls money for sex and moving young girls from one area to another. Counsel for G.A. objected. The court overruled the objection but indicated it would consider only the testimony that Dr. Kastl was familiar with the 2010 charges.

Dr. Kastl concluded that G.A. poses a danger to himself because he is very impulsive; he is unable to modify his behavior in light of experience and unable to make social judgments; and he is at risk of wandering and being vulnerable to predatory people. Dr. Kastl also concluded that G.A. poses a danger to others, particularly children, because he "functions as a much younger individual" and is "unable to modulate . . . impulses and feelings" and acts on them "whenever there is an opportunity." According to Dr. Kastl, G.A. needs constant supervision to prevent his access to children. When asked why he believed G.A. would pose a danger of acting sexually inappropriately with children, Dr. Kastl pointed to an incident sometime after 2010, during which G.A. sexually assaulted a female on a bus. Counsel for G.A. objected, and the court indicated it would not consider the testimony for the truth of the matter due to *Sanchez*. Dr. Kastl went on to testify that past behavior is the best predictor of behavior and that given G.A.'s past behavior and "inability to profit from experience," the only thing preventing the recurrence of prior behavior is supervision by another person.

When questioned if he ever asked G.A. about particular instances of inappropriate sexual behavior, Dr. Kastl indicated he had not because G.A. is incapable of communicating in that way, which he knew based on G.A.'s inability to respond to other questions. Dr. Kastl indicated that G.A.'s language is limited to a few phrases and single words, and that he is incapable of communicating, for example, why he left the gym during the incident described by Talamaivao. When asked if he was assuming the truth of the facts underlying the criminal charges against G.A., Dr. Kastl indicated he was.

After the hearing, the trial court invited and received supplemental briefs addressing the issues. On April 1, 2022, the court issued an oral ruling

5

granting the petition to extend the commitment based on its findings that G.A. continues to have a developmental disability from which he will not recover, and that he continues to present a danger to himself and others because of his disability. In a written order filed the same day, the court indicated the commitment would expire on August 17, 2022. The court also indicated it was taking judicial notice of "Mendocino County cases 01-44124 and 10-10581," i.e., G.A.'s 2001 and 2010 cases. G.A. appealed.

## DISCUSSION

Despite its mootness, we have retained this case to address G.A.'s contentions that (1) due process requires proof of a recent overt act to support a finding under section 6500 that a person with a developmental disability poses a danger to self or others; and (2) the evidence was insufficient to support his recommitment. We begin with a brief overview of the statutory scheme governing section 6500 commitments.

### A. Overview of section 6500 commitments

Section 6500 provides: "A person with a developmental disability may be committed to the State Department of Developmental Services for residential placement other than in a developmental center or state-operated community facility, as provided in subdivision (a) of Section 6509, if the person is found to be a danger to self or others." (§ 6500, subd. (b)(1).)

Section 6500, subdivision (a)(2), specifies that " '[d]evelopmental disability' " has the same meaning defined in the Lanterman Developmental Disabilities Services Act (LDDSA) (§ 4500 et seq.). In section 4512, the LDDSA defines developmental disability as "a disability that originates before an individual attains 18 years of age, continues, or can be expected to continue, indefinitely, and constitutes a substantial disability for that individual." (§ 4512, subd. (a)(1).) In turn, " '[s]ubstantial disability' means

6

the existence of significant functional limitations" in three or more enumerated major life activities, such as self-care, receptive and expressive language, learning, self-direction, capacity for independent living, and economic self-sufficiency. (§ 4512, subd. (*l*).) Developmental disability includes "intellectual disability" and "disabling conditions found to be closely related to intellectual disability." (§ 4512, subd. (a)(1).)

Section 6500 does not define " '[d]angerousness to self or others,' " but the term includes "a finding of incompetence to stand trial . . . when the defendant has been charged with . . . a violation of Section 288 . . . ." (§ 6500, subd. (a)(1).)

Over the years, California courts have imposed additional requirements for commitment under section 6500, out of the recognition that " 'civil commitment for any purpose constitutes a significant deprivation of liberty that requires due process protection.' " (*In re O.P.* (2012) 207 Cal.App.4th 924, 928–929 (*O.P.*), quoting *Addington v. Texas* (1979) 441 U.S. 418, 425.) As relevant here, courts have held that due process requires proof "that a person's [developmental disability] causes him or her to have serious difficulty in controlling dangerous behavior." (*People v. Bailie* (2006) 144 Cal.App.4th 841, 847–850, disapproved on other grounds in *People v. Barrett* (2012) 54 Cal.4th 1081, 1109 (*Barrett*); *Sweeney, supra,* 175 Cal.App.4th at p. 225.) Moreover, "due process demands proof of *current dangerousness*, linked to the defendant's [developmental disability]," and a finding of dangerousness cannot be based "solely on a finding that [the defendant] had been adjudged incompetent to stand trial and charged with a felony [described by section 6500]." (*O.P., supra*, 207 Cal.App.4th at pp. 931–933, italics added.)

7

The statutory scheme contemplates that various people, including an individual's parent, conservator, or any person designated by a court, may request that "the person authorized"—i.e., the district attorney or county counsel—file a petition for commitment of the individual under section 6500. (§§ 6500, subd. (b)(5), 6502.)  After a petition is filed, the trial court must appoint the director of "a regional center for the developmentally disabled" or a designee to conduct an examination and submit a report (§ 6504.5, subds. (a)–(b)) functioning as "a professional pretrial evaluation of the person's history, condition, and behavior" (*Barrett*, *supra*, 54 Cal.4th at p. 1104).  The report must include an assessment of the individual and a recommendation regarding the least restrictive residential placement that promotes the goals of treatment while considering public safety.  (§ 6504.5, subds. (b)–(c).)

The court must set a hearing on the petition (§ 6503), and the individual proposed for commitment has a right to a jury trial upon request (*Barrett*, *supra*, 54 Cal.4th at pp. 1096–1097).  The prosecution has the burden to prove the elements necessary for a section 6500 commitment beyond a reasonable doubt.  (*Money v. Krall* (1982) 128 Cal.App.3d 378, 348.)  If it is found "that the person has a developmental disability, and is a danger to self or to others, . . . the court may make an order that the person be committed to the State Department of Developmental Services for suitable treatment and habilitation services," meaning "the least restrictive residential placement necessary to achieve the purposes of treatment." (§ 6509, subd. (a).)

A commitment order under this statutory scheme automatically expires after one year but subsequent petitions for additional periods of commitment are permitted.  (§ 6500, subd. (b)(1)(A)–(B).)  "If subsequent petitions are

filed, the procedures followed shall be the same as with the initial petition for commitment." (§ 6500, subd. (b)(1)(B).)

## B. Due process does not require proof of a recent overt act for a finding of dangerousness under section 6500

Section 6500, subdivision (b)(3), provides: "If the person with a developmental disability is in the care or treatment of a state hospital, developmental center, or other facility at the time a petition for commitment is filed pursuant to this article, *proof of a recent overt act while in the care and treatment of a state hospital, developmental center, or other facility is not required in order to find that the person is a danger to self or others*." (Italics added.)

G.A. contends that where, as here, no criminal conviction or finding of probable cause by a magistrate or grand jury was ever made, due process requires that a finding of dangerousness be established by proof of a "recent overt act" even though the statute expressly dispenses with the need for such proof if the person proposed for commitment is receiving the statutorily contemplated care or treatment when a commitment petition is filed.

G.A. has identified no decision holding that, in the absence of a criminal conviction or finding of probable cause, due process requires proof of a recent overt act for a finding of dangerousness in the type of circumstances contemplated under section 6500, subdivision (b)(3). Nor have we found any authorities mandating such a requirement. There is, however, "substantial" authority holding generally that due process "does not require proof of a recent overt act to establish dangerousness sufficient to warrant a civil commitment." (*People v. Felix* (2008) 169 Cal.App.4th 607, 619–620 (*Felix*), and cases cited; accord, *Project Release v. Prevost* (2d Cir. 1983) 722 F.2d 960, 973–974 (*Project Release*), and cases cited; *In re Maricopa County Cause No. MH-90-00566* (1992) 173 Ariz. 177, 184 [where civil commitment statute

9

required "clear and convincing evidence of a substantial probability of harm," proof of recent overt act not required].)  This aligns with the holding in *O.P.* that due process is satisfied so long as the section 6500 commitment is predicated upon proof of "*current dangerousness* [to self or others] and not merely a prosecutor's allegation that an incompetent person committed a violent felony."  (*O.P.*, *supra*, 207 Cal.App.4th at p. 934, italics added.)

That the Legislature explicitly rejected a requirement for proof of a recent overt act in this context reflects a rational policy choice.  When a person with a developmental disability is "in the care or treatment of a state hospital, developmental center, or other facility at the time a petition for commitment is filed" (§ 6500, subd. (b)(3)), the supervised nature of the environment may provide little or no opportunity for the commission of overt acts of danger to oneself or others.  Here, for example, the nature of G.A.'s criminal charges suggests he may have a predisposition to commit a specific type of sexual offense—i.e., sex crimes against children—which he cannot act on in his current monitored environment.  Because, as a practical matter, proof of a recent overt act may not exist in cases where one has been receiving care and treatment in a supervised setting, proof beyond a reasonable doubt of the person's continuing developmental disability and current dangerousness should suffice for a civil commitment.  (See *Felix, supra*, 169 Cal.App.4th at pp. 619–620 [rejecting petitioner's contention that commitment under the Sexually Violent Predator Act implicitly requires proof of a recent overt act where 10 years had elapsed since he was last out of custody].)  Put another way, " '[d]ue process does not require that the absurd be done before a compelling state interest can be vindicated.' "  (*Felix*, at p. 618, citing *People v. Martin* (1980) 107 Cal.App.3d 714, 725 (*Martin*).)

G.A.'s authorities are not to the contrary. True, the courts that have rejected the call for proof of a recent overt act of dangerousness have done so in cases where the original commitment followed criminal convictions. (E.g., *Felix*, *supra*, 169 Cal.App.4th at p. 610; *People v. Buttes* (1982) 134 Cal.App.3d 116, 119; *Martin*, *supra*, 107 Cal.App.3d at p. 716; *People v. Henderson* (1980) 107 Cal.App.3d 475.) But those courts had no occasion to consider whether such a requirement must be imposed outside of that particular context. Accordingly, they provide no authority for the broad proposition that, absent a conviction or a finding of probable cause, proof of a recent overt act must be shown to support a finding of dangerousness in a civil commitment case. (See *Agnew v. State Bd. of Equalization* (1999) 21 Cal.4th 310, 332 [no case is authority for a proposition not considered by the court].)

G.A. contends requirement of a recent overt act is supported by *In re Smith* (2008) 42 Cal.4th 1251 (*Smith*). There, the California Supreme Court contrasted commitments under the Sexually Violent Predator Act (SVP Act) with involuntary commitment procedures and one-year conservatorships for people with mental illnesses under the Lanterman-Petris-Short Act (§ 5000 et seq.) (LPS Act). (*Smith*, at pp. 1267–1268.) "[U]nder the SVP Act those currently in prison with the requisite convictions for sexually violent offenses can be subject to continued civil commitment solely on the basis of findings that an individual has a mental disorder that makes it likely he or she will engage in sexually violent criminal behavior. (§§ 6601–6604.) On the other hand, those not in prison, including those who also have prior convictions for sexually violent offenses, can be subject to long-term civil commitment [under the LPS Act] only when . . . they are determined to be *gravely disabled or to have a mental disorder and to be a danger to self and others as shown by*

11

*recent acts.*" (*Smith*, at p. 1268, italics added.) In G.A.'s view, this passage supports a general requirement for proof of a recent overt act of dangerousness in cases where a criminal conviction or probable cause finding is lacking. We cannot agree.

The issue in *Smith* was whether the SVP Act permitted an SVP commitment to proceed where, after SVP commitment proceedings were initiated against the petitioner, the felony conviction serving as the basis of the petitioner's custody was reversed on appeal. (*Smith*, *supra*, 42 Cal.4th at p. 1255.) *Smith* included the above-quoted passage as part of an equal protection analysis which favored a construction of the SVP Act that did not permit such proceedings to continue. (*Id.* at pp. 1262–1269.) But in describing the criteria for LPS Act commitments, *Smith* was not purporting to cast doubt on other commitment schemes based on different criteria and different required showings. Nor was *Smith* implying that the Legislature was powerless to authorize civil commitments without proof of a recent overt act of dangerousness under the type of circumstances specified in section 6500, subdivision (b)(3), or that due process requires such proof to justify all commitments in cases lacking evidence of a conviction or probable cause finding. We see nothing in *Smith* that so suggests. Moreover, G.A. fails to address the portion of the quoted passage indicating that a long-term civil commitment under the LPS Act can be justified on grounds of grave disability—e.g., an inability to provide for one's basic personal needs— without proof of a recent overt act. (§ 5008, subd. (h)(1).)

G.A.'s other authorities are likewise unavailing, as none of them indicates that proof of a recent overt act is constitutionally required for a civil commitment if a criminal conviction or a finding of probable cause is lacking. (See, e.g., *Conservatorship of Hofferber* (1980) 28 Cal.3d 161, 176, 178

12

[requiring a hearing and written findings to find a person gravely disabled under amendments to the LPS Act]; *Jackson v. Indiana* (1972) 406 U.S. 715, 731, 738 [holding that Indiana's law allowing indefinite commitment *solely* on grounds of incompetency violated due process and that Indiana must either institute civil commitment proceedings or release a defendant who will not attain competency to proceed to trial in the foreseeable future].)  Nor do the authorities address why due process principles might be violated when proof of a recent overt act of dangerousness is not required for recommitment when the person with a developmental disability is in the care or treatment of a state hospital, developmental center, or other facility.

As for *Suzuki v. Yuen* (9th Cir. 1980) 617 F.2d 173, that case concerned a Hawaiian civil commitment statute that provided for psychiatric hospitalization (with no less restrictive alternatives) of mentally ill persons in need of care or treatment who were a danger to themselves or others or to property.  (*Id.* at pp. 174–175, fn. 2.)  In striking down the statute on due process grounds, the federal district court concluded in relevant part:  "The proper standard is that which requires a finding of imminent and substantial danger as evidenced by a recent overt act, attempt or threat."  (*Id.* at p. 178, quoting *Suzuki v. Alba* (D.Haw. 1977) 438 F. Supp. 1106, 1108, 1110, 1112, italics omitted.)  Although the Ninth Circuit in *Suzuki v. Yuen* agreed that "the danger must be imminent to justify involuntary commitment," it did not specifically address the district court's requirement of a "recent overt act, attempt or threat."  (*Suzuki v. Yuen*, at p. 178.)

Nonetheless, even assuming *Suzuki v. Yuen* adopted the district court's recent overt act requirement, federal decisions are not binding on this court. (*People v. Cleveland* (2001) 25 Cal.4th 466, 480.)  More to the point, courts in California and elsewhere have rejected the need for such proof and have

13

instead indicated that due process is satisfied as long as there is evidence of current dangerousness. (See *O.P.*, *supra*, 207 Cal.App.4th at p. 934; *Felix*, *supra*, 169 Cal.App.4th at p. 619, and cases cited; accord, *Project Release*, *supra*, 722 F.2d at pp. 973–974, and cases cited.) We stand with these authorities.

In sum, we reject G.A.'s contention that due process requires proof of a recent overt act notwithstanding the express language of section 6500, subdivision (b)(3), providing to the contrary.

### C. Substantial evidence review

G.A. next contends the grounds for extension of his commitment were not established by substantial evidence. We agree, in part.

In conducting a substantial evidence review, we " ' "view the evidence in a light most favorable to respondent and presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence." [Citations.]' [Citation.] To be substantial, the evidence must be ' "of ponderable legal significance . . . reasonable in nature, credible and of solid value." ' [Citation.] The issue must be resolved in light of the entire record." (*People v. Cuevas* (2013) 213 Cal.App.4th 94, 106–107.) We bear in mind that the standard of proof beyond a reasonable doubt applies to the court's finding in this case, and the degree of confidence such a finding requires. (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1005, 1007–1008, 1011.)

Here, G.A. concedes there is substantial evidence that he has a developmental disability. We accept that concession, noting Dr. Kastl testified that recent IQ tests of G.A. resulted in a score of 42, which reflects a "very significant impairment" and is in the range of "moderate intellectual

14

disability." We turn first to discuss G.A.'s challenge to the trial court's finding that he poses a danger to others.

1. *Dangerousness to others*

The record reflects substantial evidence that G.A. falls within the statutory contemplation of " '[d]angerousness to self or others' " set out in section 6500, subdivision (a)(1), insofar as G.A. was found incompetent after he was charged with sex crimes against children in 2010 (Pen. Code, §§ 209, subd. (b) & 288.7, subd. (a)) and in 2001 (§§ 288, subd. (a), 243.4, subd. (a)).

Though the foregoing evidence appears to fall within the explicit statutory terms for a commitment, case law holds that due process requires more. Specifically, "due process demands proof of *current dangerousness*," linked to the proposed committee's developmental disability, and a finding of dangerous cannot be based "solely on a finding that [the proposed committee] had been adjudged incompetent to stand trial and charged with a felony [described by section 6500]." (*O.P.*, *supra*, 207 Cal.App.4th at pp. 931–932, italics added.)

In this case, the only evidence that G.A. is a danger to others is the charges against him and the subsequent findings of incompetence. True, Dr. Kastl provided an expert opinion that G.A. poses a current danger to others, particularly children. But Dr. Kastl based his opinion primarily on G.A.'s alleged past instances of misconduct, which Dr. Kastl learned about and assumed were true from his review of unspecified records. In Dr. Kastl's opinion, past behavior is the best predictor of behavior and, in view of G.A.'s past behavior and "inability to profit from experience," he concluded the only thing preventing the recurrence of G.A.'s prior behavior is supervision by another person. In assessing whether Dr. Kastl's opinion provided substantial evidence for a finding of danger to others, we consider Dr. Kastl's

15

reliance on hearsay in forming his opinion and the evidentiary value of his opinion.

In *Sanchez*, the California Supreme Court confirmed that experts "can rely on background information accepted in their field of expertise" and "on information within their personal knowledge." (*Sanchez, supra*, 63 Cal.4th at p. 685.) Experts may also rely "on hearsay in forming an opinion, and may tell the [factfinder] *in general terms* that [they] did so." (*Ibid*.) But importantly, *Sanchez* held that an expert cannot "relate as true case-specific facts asserted in hearsay statements, unless they are independently proven by competent evidence or are covered by a hearsay exception." (*Id.* at p. 686.) There appears no dispute that *Sanchez* applies to the present commitment proceeding. (*People v. Bona* (2017) 15 Cal.App.5th 511, 515, 520; *People v. Jeffrey G.* (2017) 13 Cal.App.5th 501, 507; *People v. Yates* (2018) 25 Cal.App.5th 474, 483.)

Here, the trial court specifically indicated it would consider only the testimony that Dr. Kastl was familiar with the prior criminal charges and not consider his testimony for the truth of the matters stated. Accordingly, we may assume the court did not view Dr. Kastl's testimony as providing actual proof that G.A. committed sexual misconduct in 2001 and 2010. Nor do we.

But the fact remains that Dr. Kastl's opinion of G.A.'s current dangerousness to others was based not only on his observations of G.A.'s continuing state of impairment and developmental disability, but primarily on his understanding of G.A.'s past behavior, which he developed from his review of unspecified records referencing the 2001 and 2010 incidents.

In assessing the evidentiary value of Dr. Kastl's opinion, we are mindful that an expert witness "does not possess a carte blanche to express any opinion within the area of expertise." (*Jennings v. Palomar Pomerado*

16

*Health Systems, Inc.* (2003) 114 Cal.App.4th 1108, 1117.) When an expert's opinion is "based on assumptions of fact without evidentiary support," or "on speculative or conjectural factors," it has "no evidentiary value." (*Ibid.*, and cases cited.) Moreover, a judgment based solely on an expert opinion that relied on such assumptions and factors must be reversed for lack of substantial evidence. (*People v. Wright* (2016) 4 Cal.App.5th 537, 545 (*Wright*).)

Applying these principles, we cannot conclude that Dr. Kastl's opinion furnished substantial evidence of G.A.'s current dangerousness to others. The record reflects that Dr. Kastl's opinion was based, in the main, on factual assumptions he made after reviewing unspecified documents referencing alleged incidents of prior sexual misconduct. But the People did not identify or present the documents in question, and offered no evidence supporting the veracity of their contents. Nor was there any other evidence showing that G.A. actually engaged in the prior incidents of misconduct. (*Wright*, *supra*, 4 Cal.App.5th at pp. 545–546.) Because Dr. Kastl's opinion of G.A.'s current dangerousness to others relied on unsupported assumptions of fact, it did not suffice as substantial evidence supporting G.A.'s recommitment. (*Id.* at p. 545.)

2. *Dangerousness to self*

Next, we turn to discuss the trial court's finding that an extended commitment was appropriate because G.A. poses a danger to himself. In short, the parties dispute whether this finding is substantially supported by the testimony of Talamaivao and Dr. Kastl concerning the degree of G.A.'s intellectual and functional limitations, such as his inability to perform basic daily skills without support or guidance, his inability to either modify his behavior in light of experience or make social judgments, his impulsiveness,

17

and his vulnerability to predatory people. At the heart of this dispute is a lurking but important question of statutory interpretation: what is the meaning of " '[d]angerousness to self' " in the context of section 6500?

Section 6500 itself does not provide a clear definition of the phrase (*People v. Hartshorn* (2012) 202 Cal.App.4th 1145, 1152 (*Hartshorn*)), though it incorporates the definition of "developmental disability" as provided in section 4512 of the LDDSA.[2] But there is another LDDSA provision—not mentioned by the parties—which seemingly bears on the issue here. That provision appears to authorize persons with developmental disabilities to file a habeas corpus petition seeking release from a commitment (see § 4800), as follows: "If the person is charged with a violent felony and has been committed to his or her current placement pursuant to . . . *Section 6500*, and the court finds (A) that the adult requesting release or for whom release is requested is not a person with a developmental or intellectual disability, or (B) that he or she *is able to provide safely for his or her basic personal needs for food, shelter, and clothing*, the court shall, before releasing the person, determine that the release will not pose a danger to the health or safety of others due to the person's known behavior." (§ 4801, subd. (c)(3), italics added.) This statute suggests, at least facially, that persons with developmental disabilities may be subject to ongoing commitment if they are unable to provide for their own basic needs.

---

[2]	To reiterate, section 6500, subdivision (a)(2), incorporates section 4512's definition of " '[d]evelopmental disability' " as "a disability that originates before an individual attains 18 years of age, continues, or can be expected to continue, indefinitely, and constitutes a *substantial disability* for that individual" (§ 4512, subd. (a)(1), italics added) and its further definition of " '[s]ubstantial disability' as "the existence of significant functional limitations" in three or more enumerated major life activities, such as self-care, receptive and expressive language, learning, self-direction, capacity for independent living, and economic self-sufficiency (§ 4512, subd. (*l*)).

18

Apart from the LDDSA, we note *Hartshorn*, *supra*, 202 Cal.App.4th 1145 and *People v. Alvas* (1990) 221 Cal.App.3d 1459 looked to the LPS Act in holding that section 6500 contemplates "conduct that presents the likelihood of serious physical injury" and not merely "[t]he vagaries of emotional injury, mere apprehension of physical injury, speculation and conjecture." (*Hartshorn*, at pp. 1153–1154; *Alvas*, at p. 1467.) Though the parties appear to disagree over whether this construction of section 6500 could be satisfied by the evidence in this case, neither party questions *Hartshorn* and *Alvas*'s reliance on the LPS Act to ascertain the meaning of dangerousness under section 6500 (see *Alvas*, at p. 1467). We have found no decisions either following or criticizing this aspect of *Hartshorn* and *Alvas*, and the Legislature has not amended section 6500 in response to these cases.

Assuming the LPS Act is properly consulted for purposes of interpreting section 6500's "danger to self" language, we note the act appears to distinguish "grave disability" from a person's dangerousness to self. Under the LPS Act, the term "grave disability" is defined to mean "[a] condition in which a person, as a result of a mental health disorder, is unable to provide for his or her basic personal needs for food, clothing, or shelter." (§ 5008, subd. (h)(1)(A).) That the term "grave disability" contemplates something other than a person's dangerousness to self is reflected in section 5150, which includes references to both concepts in authorizing short term emergency detention when a person, "as a result of a mental health disorder, is a *danger* to others, or *to themselves, or gravely disabled.*" (Italics added.)

Notably, "grave disability" is not a term appearing in the statutory scheme encompassing section 6500. Thus, one might view this omission as significant given that the Legislature could similarly (and explicitly) have allowed for commitment of developmentally disabled persons who cannot

19

safely provide for their basic needs.  (Cf. *People v. Salmorin* (2016) 1 Cal.App.5th 738, 750 ["when the Legislature wants to define a crime using aggregation principles, 'it knows how to say so' "].)  On the other hand, some have observed in the LPS context that dangerousness to self is implicit in one's inability to provide for one's basic needs.  (*Doe v. Gallinot* (C.D.Cal. 1979) 486 F.Supp. 983, 991 ["California's 'gravely disabled' standard . . . implicitly requires a finding of harm to self:  an inability to provide for one's basic physical needs"]; see Byun, *Gravely Disabled: The Vestigial Prong of 5150 Designations* (2021) 34 J.L. & Health 190, 205–206.)  In any event, the parties have not addressed what legislative intent, if any, may be gleaned from section 6500's omission of the term "gravely disabled."

Moreover, among the cases cited by the parties, one California Supreme Court case viewing older versions of these commitment statutes had this to say regarding legislative purpose:  "The sole state interest [of former sections 6500 through 6512], legislatively expressed, is the custodial care, diagnosis, treatment, and protection of persons who are *unable to take care of themselves and who for their own well being* and the safety of others *cannot be left adrift in the community*."  (*Cramer v. Tyars* (1979) 23 Cal.3d 131, 137, italics added.)  Though the statutory scheme has since been revised, pronouncements such as this suggest there may be a current expression of legislative purpose that we have not had the opportunity to appraise because the parties have offered no clear or adequate analysis concerning the proper interpretation of section 6500.

For his part, G.A. notes that section 4507 in the LDDSA provides that "[d]evelopmental disabilities alone shall not constitute sufficient justification for judicial commitment" and that "[p]ersons who constitute a danger to themselves or others may be judicially committed pursuant to [section 6500]

20

if evidence of such danger is proven in court." He also cites section 4502, subdivision (b)(2), which guarantees rights for people with developmental disabilities, such as the right to treatment and habilitation services in the least restrictive setting. We acknowledge these statutes serve to ensure that people with developmental disabilities have the right to "dignity, privacy, and humane care" and the right to "treatment, services, and supports" provided "in natural community settings" to "the maximum extent possible." (§ 4502, subd. (b)(2).) Such statutes might also be viewed as supporting the conclusion that depriving such people of their liberty through a civil commitment should require more than a mere finding of a developmental disability as defined in section 4512, subdivisions (a)(1) and (*l*).

Nonetheless, G.A. attempts no explanation or legislative analysis of what the LDDSA statutes might allow in terms of a showing of danger to self under section 6500. For example, G.A. does not address the potential overlap between (1) the symptoms or behaviors that indicate a developmental disability under section 4512 and (2) the symptoms or behaviors of a developmental disability that render people a danger to themselves. In short, it is unclear whether section 6500 could or should be construed as largely precluding the consideration of the symptoms or behaviors constituting a " '[d]evelopmental disability' " and a " '[s]ubstantial disability' " (§ 4512) as evidence establishing a person's dangerousness to self.

In sum, there are conflicting indicia of legislative intent concerning the proper interpretation of section 6500 and its contemplation that persons with developmental disabilities are subject to civil commitment if they are found to pose a danger to themselves. Considering the lack of adequate briefing and the seriousness of the civil liberty and safety interests at stake, we decline to

21

offer a construction in this moot case.  Nonetheless, we note our observations to provide some analytical considerations in future litigation.

## DISPOSITION

We conclude subdivision (b)(3) of section 6500 does not violate due process by dispensing with the need for proof of a recent overt act of dangerousness.  We also conclude substantial evidence did not support the finding of G.A.'s dangerousness to others.  However, we decline to decide whether substantial evidence supported the finding of G.A.'s dangerousness to himself.  We dismiss the appeal as moot.


_____
Fujisaki, J.


WE CONCUR:


_____
Tucher, P.J.


_____
Petrou, J.


*People v. J. G.A.* (A164980)

Trial Court:      Mendocino County Superior Court

Trial Judge:      Hon. Keith Faulder

Counsel:          Law Office of Jean F. Matulis, Jean F. Matulis, under
                  appointment by the First District Appellate Project for
                  Defendant and Appellant

                  Rob Bonta, Attorney General of California, Lance E.
                  Winters, Chief Assistant Attorney General, Jeffrey M.
                  Laurence, Senior Assistant Attorney General, Arthur P.
                  Beever, Deputy Attorney General, and Lisa Ashley Ott,
                  Deputy Attorney General, for Plaintiff and Respondent